**ROME & ASSOCIATES, A.P.C.**
Eugene Rome (SBN 232780)
erome@romeandassociates.com
Brianna Dahlberg (SBN 280711)
bdahlberg@romeandassociates.com
2029 Century Park East, Suite 450
Los Angeles, California 90067
Telephone: (310) 282-0690
Facsimile: (310) 282-0691

Attorneys for Plaintiff
ARSHAD ASSOFI

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARSHAD ASSOFI, an individual,<br><br>Plaintiff,<br><br>v.<br><br>DONALD BASILE, an individual, GIBF GP, Inc. d/b/a BITCOIN LATINUM, a Delaware corporation, and DOES 1 through 10,<br><br>Defendants. | Case No.  2:22-cv-8313<br><br>**COMPLAINT FOR:**<br>**(1) UNREGISTERED OFFER AND SALE OF SECURITIES IN VIOLATION OF SECTIONS 5 AND 12(A) OF THE SECURITIES EXCHANGE ACT**<br>**(2) STATE LAW VIOLATION FOR UNREGISTERED OFFER AND SALE OF SECURITIES**<br>**(3) SECURITIES FRAUD IN VIOLATION OF SECTION 10(B) OF THE SECURITIES EXCHANGE ACT AND RULE 10B-5**<br>**(4) UNREGISTERED DEALER/BROKER UNDER SECTION 15(A)(1) OF THE SECURITIES EXCHANGE ACT**<br>**(5) STATE LAW SECURITIES FRAUD VIOLATIONS**<br>**(6) RESCISSION UNDER SECTION 29(B) OF THE SECURITIES EXCHANGE ACT**<br>**(7) FRAUD**<br>**(8) CONVERSION**<br>**(9) VIOLATION OF PENAL CODE § 496**<br><br>**[DEMAND FOR A JURY TRIAL]** |

1

COMPLAINT

Plaintiff ARSHAD ASSOFI ("Assofi" or "Plaintiff"), by and through his undersigned attorneys, hereby complains against Defendants Donald Basile, GIBF GP, Inc. d/b/a BITCOIN LATINUM ("GIBF") and DOES 1 through 10 (collectively, "Defendants"), as follows:

**NATURE OF THE ACTION**

1. As stated by Gary Gensler of the Securities and Exchange Commission, the cryptocurrency market is "rife with fraud, scams and abuse." This case, resulting from the actions of Basile, his company GIBF and various accomplices meets all three descriptions of activities perpetrated by unscrupulous individuals in the cryptocurrency space.

2. Here, Basile employed a new and worthless token – Bitcoin Latinum – to defraud and relieve Assofi of over $15 million. He did this by making a series of claims to Assofi which touted Bitcoin Latinum as the coin that would take over the crypto markets. Among other claims, Basile has stated to Assofi that:

- Bitcoin would "hard-fork"[1] into Bitcoin Latinum
- Bitcoin Latinum would be interchangeable with Bitcoin
- Bitcoin Latinum was the only insured cryptocurrency
- Dubai investors poured $100 million into Bitcoin Latinum
- Dubai investors would install 100,000 ATMs for Bitcoin Latinum

3. Relying on Basile's statements and representations, Assofi delivered $15,555,329 (fifteen million, five-hundred fifty-five thousand, three hundred and twenty-nine dollars) to Basile and GIBF. In the end, none of the above proved true.

---

[1] A "hard fork" refers to a radical change to the protocol of a blockchain network that effectively results in two branches, one that follows the previous protocol and one that follows the new version. In a hard fork, holders of tokens in the original blockchain will be granted tokens in the new fork as well, but miners must choose which blockchain to continue verifying. In effect, here, Basile suggested that Bitcoin Latinum would replace Bitcoin, either in full or in significant part.

1  Instead, the plain reality of what happened with Assofi's invested funds was candidly
2  acknowledged by GIBF's head of social media who wrote Assofi the following from
3  Bitcoin Latinum's official account:



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17



18    4.    Assofi understands, both from statements above and from industry

19 conversations that the above is exactly what Basile did with his funds, fund a lavish

20 lifestyle built upon his fraud. This action seeks to redress these acts.

21    **THE PARTIES, JURISDICTION, AND VENUE**

22    5.    Plaintiff Arshad Assofi, at all times relevant hereto is a citizen of Los

23 Angeles County, California.

24    6.    Defendant Donald Basile is an individual who, at the time of the subject

25 transactions, was a citizen of the State of California.

26    7.    Defendant GIBF GP, Inc. d/b/a Bitcoin Latinum (Delaware File No.

27 6892036) is a Delaware corporation that identifies on its Bitcoin Latinum website and

28

1  in press releases that its principal place of business is 2100 Geng Road, Palo Alto,
2  California 94303. A Delaware entity search reveals that GIBF GP, Inc. is a Delaware
3  corporation, the registered agent of which is The Corporation Trust Company, located
4  at Corporation Trust Center 1209 Orange Street, Wilmington, DE 19801, New Castle
5  County.

6      8.     Plaintiff files this Complaint and institutes these proceedings to recover
7  damages that Plaintiff sustained arising from Defendants' unregistered offers and sales
8  of securities in violation of sections 5, 12(a)(1) and 15 of the Securities Act of 1933, 15
9  U.S.C. §77e, 77l(a)(1), 77o, 78o, ("Securities Act"); section 10(b), 15 U.S.C. §78j(b)
10  of the Securities Exchange Act of 1934 ("Exchange Act"); and sections 25110, 25503,
11  25504 and 25401 of the California Corporations Code; fraud, conversion and Cal. Penal
12  Code violations.

13     9.     This Court has subject matter jurisdiction over the federal law claims (*i.e.*
14  Securities Act and the Exchange Act claims) pursuant to 28 U.S.C. § 1331. This Court
15  has subject matter jurisdiction over the pendant state law claims pursuant to 28 U.S.C.
16  § 1367(a).

17    10.     This Court has personal jurisdiction over Plaintiff and Defendants pursuant
18  to federal law.

19    11.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a
20  substantial part of the events and/or omissions giving rise to Plaintiff's claims occurred
21  within this district, *inter alia*, the initial presentation of the investment opportunity was
22  made by Basile, on behalf of himself and GIBF, at Assofi's residence in Los Angeles,
23  California.

## ALTER EGO ALLEGATIONS

24
25    12.     At all times relevant hereto, GIBF and Basile were alter egos of each other
26  and there existed a unity of interest and ownership between GIBF and Basile such that
27  the separateness of the two companies never existed.  Indeed, when Basile requested

28  _____

1  that Assofi deliver funds to him for investment in GIBF, he often requested cash over
2  which he took personal possession. All of the acts and omissions described in this
3  Complaint by any defendant were duly performed by, and attributable to, all defendants,
4  each acting as agent, employee, alter ego and/or under the direction and control of the
5  others, and such acts and omissions were within the scope of such agency, employment,
6  alter ego, direction, and/or control. Denying the unity of interest between GIBF GP, Inc.
7  and Basile and adhering to the fiction of the separate existence between them would
8  result in fraud and inequity to Assofi. Any reference in this complaint to any acts of
9  defendants shall be deemed to be the acts of each defendant acting individually, jointly,
10 or severally.

11     13.    The true names and capacities, whether corporate, associate, individual,
12 partnership or otherwise of defendants Does 1 through 10, inclusive, are unknown to
13 Plaintiff, and will therefore sue said defendants by such fictitious names. Plaintiff will
14 seek leave of court to amend this Complaint to allege their true names and capacities
15 when the same are ascertained.

16                         **GENERAL ALLEGATIONS**

17     **A.     GIBF's Sale of Tokens to the Public**

18     14.    In November of 2020, GIBF announced it planned to release for purchase
19 to the general public a Token that it claims is a cryptocurrency, which unlike fiat
20 currency, is created, distributed, traded, and stored with the use of an online ledger
21 system known as a blockchain.

22     15.    By at least early 2021, GIBF was actively selling "Pre-Sale Tokens"
23 directly through its website to U.S. residents.

24     16.    These Pre-Sale Tokens could be purchased by anyone through GIBF's
25 website.

26
27
28

17. Based on GIBF's press releases, GIBF claims that it made Pre- Sale Tokens available for limited periods of time, in at least three waves of public offerings since 2020.

18. Indeed, on GIBF's home page, there were two separate "buttons" that read "Buy Tokens." A website user need only navigate through the online prompts to invest funds.

19. Although GIBF allowed the general public to purchase its pre-sale Tokens through its website—an option typically reserved for founders or early accredited investors—it had not released the Tokens for trading (*i.e.*, disbursed any Tokens to its crypto-wallet).[2]

20. Instead, GIBF announced that its Tokens would be released to investor crypto-wallets at a specific date (akin to an ICO/IPO) unilaterally determined by GIBF in its sole discretion.

21. At first, GIBF announced that its Token would be available for trading in October of 2021.

22. Then, GIBF told investors that the Token would be available in early 2022.

23. Now, GIBF claims the Token will be available in early 2023.

24. To date, GIBF has not released any Tokens to investor crypto-wallets.

25. In addition to purchasing Tokens through GIBF's website, GIBF listed its Token on what it claims to be public exchanges—which are not regulated by the SEC.

26. Upon information and belief, GIBF's Token – LTNM – is not at all what it purports to be—as detailed below, the technological overpromises, the manner in which it engaged in fundraising from the public, and the repeatedly delayed release date

---

[2] GIBF launched a crypto-wallet that was supposed to give its investors the ability to view their account balances and trade Latinum's Token on digital exchanges. GIBF's crypto-wallet was made available for download on the Google Play Store™ and Apple App Store™, and had over 500 downloads, which demonstrates the breadth of investors to which this fraudulent scheme has reached.

1   gives rise to the inference that GIBF touted and sold a Token that has not yet been
2   developed (by Monsoon Blockchain) and/or lacks the capabilities represented to
3   investors.

**B.      Latinum's Tokens – LTNM – are Securities Subject to the
Securities Act's Registration Requirement**

6          27.     At the outset, GIBF's own documents utilized to consummate sales
7   transactions, as referenced in a separate case entitled *Raymond Jonna v. Kevin Jonna*
8   *and Bitcoin Latinum, et al.,* United States District Court for the Eastern District of
9   Michigan Case No. 2:22-cv-10208-RHC-JJCG (the "*Jonna Lawsuit*") confirm that its
10  Token is a security within the meaning of the Securities Act of 1933: "[T]his SAFT is
11  a security that has not been registered under the Securities Act . . . [and] will not be
12  registered under the Securities Act of 1933, and may not be offered or sold in the United
13  States absent registration or an applicable exemption from the registration
14  requirements." *See Jonna Lawsuit*, ECF No. 22-2, PageID.514; 517.

15         28.     Yet, GIBF claims that its Token is a cryptocurrency like Bitcoin. But, to
16  the extent GIBF's Token even exists, GIBF's claimed Token features are a radical
17  departure from Bitcoin's decentralized cryptocurrency model. [3]

18         29.     Notably, GIBF's press releases often cite to Bitcoin's stability and growth
19  as an indicator that its own Token will be similarly accepted by the cryptocurrency
20  community, which is materially false and misleading.

21         30.     Unlike Bitcoin, GIBF's Token displays all the characteristics of a security,
22  and more specifically an investment contract, as defined under the Securities Act and

---

25         [3]      For instance, Bitcoin is run by unaffiliated entities known as "miners," who are
26  competing to validate transactions and enter them on the digital ledger. They are competing because,
    if successful, they will be rewarded with newly generated Bitcoin. This methodology is called "proof-
27  of-work." Latinum, on the other hand, purports to utilize a modified "proof-of-stake," system, which
    is not decentralized as it is subject "pre-mining" and Latinum's control.

by the United States Supreme Court in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) ("*Howey*").

31.   In *Howey*, the Court developed what is known as the "*Howey* Test" to evaluate whether certain transactions qualify as "investment contracts" under the Securities Act.   Under the *Howey* Test, a transaction is an investment contract if: (1) it is an investment of money; (2) there is an expectation of profits from the investment; (3) the investment of money is in a common enterprise; and (4) any profit comes from the efforts of a promoter or a third party.

32.   The first prong of the *Howey* Test is typically satisfied in an offer and sale of a cryptocurrency because the cryptocurrency is purchased or otherwise acquired in exchange for value, whether in the form of currency or other consideration.

33.   Plaintiff in this matter engaged in a transaction with Defendants, by which Plaintiff delivered or caused to be delivered to Defendants the sum of $15 million in U.S. currency in exchange for Tokens.

34.   Further, in evaluating digital assets or cryptocurrencies, courts have typically found that a "common enterprise" exists.

35.   In this matter, the "common enterprise" is GIBF.

36.   The main issues in analyzing a digital asset or cryptocurrency under the *Howey* Test are typically whether there is an expectation of profits from the investment and whether those profits come from the effort of a promoter or third party.

37.   When a reasonable expectation of profits exists, the investment is more likely to qualify as a security.

38.   In determining whether a reasonable expectation of profits exists, the United States Securities and Exchange Commission ("SEC") has issued guidance stating that, the more of the following characteristics that are present, the more likely it is that there is a reasonable expectation of profit:

a.  The digital asset gives the holder rights to share in the enterprise's income or profits or to realize gain from capital appreciation of the digital asset;

b.  The digital asset is transferable or traded on or through a secondary market or platform, or is expected to be in the future;

c.  Purchasers would reasonably expect that a promoter or third party's efforts would result in capital appreciation of the digital asset and therefore be able to earn a return on their purchase.

d.  The digital asset is offered broadly to potential purchasers as compared to being targeted to expected users of the goods or services or those who have a need for the functionality of the asset;

e.  There is little apparent correlation between the offering price of the digital asset and the market price of the particular goods or services that can be acquired in exchange for the digital asset;

f.  A promoter or third party has raised an amount of funds in excess of what may be needed to establish a functional network or digital asset;

g.  A promoter or third party is able to benefit as a result of holding the same class of digital assets as those being distributed to the public;

h.  A promoter or third party continues to expend funds from proceeds or operations to enhance the functionality or value of the network or digital asset; and

i.  The digital asset is marketed, directly or indirectly, using the expertise of a promoter or third party, based on the future (and not present) functionality of the digital asset, based on promises to build a business or operation versus currently available goods, and promising appreciation in value.

39.     Defendants Basile and GIBF that operates the https://bitcoinlatinum.com website provided information to and enticed Plaintiff to invest in Tokens with an expectation of profits. Specifically,

   a. GIBF's website advertises itself as the "next-generation Bitcoin blockchain-based token, capable of massive transaction volume, digital asset management, cybersecurity, and transaction capacity." GIBF's website further states "Bitcoin Latinum asset backing is held in a fund model so that base asset value increases over time. It accelerates this asset back funds growth by depositing 80% of the transaction fee back into the asset fund."

   b. GIBF's website offered its Tokens for "Pre-Sale" to the general public.

   c. GIBF's website advertises that the Token is currently listed on crypto exchanges under the ticker "LTNM."

   d. GIBF purports to target the "Media, Gaming, Cloud Computing, and Telecommunications Industries."

   e. GIBF's website provides a "Bitcoin Latinum Investor Analysis," a "Bitcoin Latinum Investor Overview," and a "Bitcoin Latinum Whitepaper," which includes projections, risks and mitigating factors, competition, and other indicia of a prospectus or private placement memorandum.

   f. Basile personally represented to Plaintiff that all proceeds from sale of Latinum will be stored in a vault; every time there was a transaction, the transaction fee of some 10% would "go into Latinum" and build up value.

40.     In evaluating whether any profit comes from the efforts of a promoter or third party, the SEC issued guidance stating that the inquiry into whether a purchaser is relying on the efforts of others focuses on two key issues: (1) does the purchaser

reasonably expect to rely on the efforts of a promoter or third party; and (2) are those efforts undeniably significant ones (including the essential managerial efforts which affect the failure or success of the enterprise) as opposed to efforts that are more ministerial in nature.

41.   If a digital asset has the aforementioned characteristics, then it is highly likely that the SEC will consider it to be a security subject to the SEC's registration requirements. Indeed, it appears that the SEC views most cryptocurrencies as securities, and GIBF projects all such hallmarks of a security.

42.   Plaintiff reasonably expected to rely on the efforts of GIBF, and those efforts of GIBF were undeniably significant (*i.e.*, essential managerial efforts which affect the failure or success of the enterprise).

43.   Applying the *Howey* Test, an investment in Tokens is considered an investment contract – *i.e.*, a security.[4]

44.   Indeed, significantly, on September 15, 2022, SEC Chairman Gary Gensler stated that, in his opinion, staking-based cryptocurrencies that use the "proof-of-stake" system—which is the system that Latinum will purportedly use— are "very likely securities that [pass the *Howey* test and] should be regulated by the agency [*i.e.*, the SEC]."[5]

45.   Section 5(a) of the Securities Act (15 U.S.C. § 77e(a)) provides that, unless a registration statement is in effect as to a security or an exemption from registration applies, then it is unlawful for any person, directly or indirectly, to offer and sell securities in interstate commerce.

46.   Section 5(c) of the Securities Act (15 U.S.C. § 77e(c)) provides a similar prohibition against offers to sell (or offers to buy) unless a registration statement is on

---

[4]   See *Diamond Fortress Techs., Inc. v. EverID, Inc.*, 274 A.3d 287 (Del. 2022).

[5]   https://qz.com/ethereum-s-merge-may-put-it-in-the-sec-s-crosshairs-1849557858

1    file and in effect with the SEC.  Sections 5(a) and 5(c) of the Securities Act prohibit the

2    offer or sale of unregistered securities in interstate commerce absent an applicable

3    exemption.

4         47.     Defendants did not register its Token with the SEC.[6]  Nor did GIBF file a

5    Notice of Exempt Offering on Form D with the Securities and Exchange Commission,

6    which is a "safe harbor" notice of reliance and exemption from SEC registration

7    requirements.  Nor have Defendants filed any required notice of exempt securities

8    offerings with any state securities regulator.

9         48.     In fact, as stated above, GIBF's own documents, agreements, and

10    investment contracts admit that its Tokens are securities within the meaning of the

11    Securities Act of 1933 and that the Tokens are unregistered and subject to prohibition

12    from sale in the United States.

13         49.     Further, GIBF's CEO, Basile, has publicly characterized GIBF's Token as

14    an "asset backed security."[7]  Basile also states that "we need [] people to be able to see

15    that it is going to grow over time . . . Latinum [is] based upon the idea of an underlying

16    trust fund…the value of the currency increases the more it is used, it is a true network

17    affect currency where its value is exponentially increased as the adoption increases."[8]

18         50.     Rule 506 of Regulation D makes exemptions under Regulation D,

19    Regulation A+ and Regulation CF unavailable for any securities offering in which

20    certain "felons" or other "bad actors" are involved. The disqualification provisions in

21    Rule 506(d) prohibit issuers or other "covered persons" from participating in Rule 506

22

23

---

24         [6]     See publicly available EDGAR system, at https://www.sec.gov/edgar/search-and-access; see also ECF No. 44, at ¶¶ 31, 130 (Latinum admitting this).

25         [7]

26    https://www.sec.gov/Archives/edgar/data/1823144/000110465921108086/tm2125626d1_defa14a.htm.

27         [8]     *Id.*

28

offerings, if they have been convicted of a felony, or are subject to court or administrative sanctions for securities fraud or other violations of specified laws.

51.   A "covered person" includes, but is not limited to, the issuer, affiliated issuers, directors and officers of the issuer, promoters, and any person that has been or will be paid (directly or indirectly) remuneration for solicitation of purchasers in connection with such sale of securities.

52.   Under Regulation D, Regulation A+ or Regulation CF, a disqualification from the use of the applicable exemption occurs if (1) a covered person is involved in the offering, (2) that covered person is subject to one or more of the relevant disqualifying events and (3) the disqualifying event occurs within the lookback period provided by the regulation.

53.   Plaintiff is informed by the allegations set forth in the *Jonna Lawsuit* that Defendants employ at least one promoter and solicitor of GIBF who offered and sold the Tokens as a "control person" as defined in Rule 506(d). Plaintiff is further informed that this control person is subject to a disqualifying event under Rule 506(d). As such, Defendant GIBF is prohibited from utilizing the exemptions from registration available under Regulation D, Regulation A+ and Regulation CF.

54.   At all relevant times, none of the Defendants and third parties, were registered as broker-dealers with the SEC or with the Financial Industry Regulatory Authority ("FINRA") or associated with a registered broker-dealer.

55.   An unregistered person or entity who receives or facilitates transaction-based compensation for the sale of a security violates section 15(a)(1) of the Exchange Act, 15 U.S.C. §78o(a)(1).

56.   Persons who knowingly violate provisions of the Securities Act and the Exchange Act are subject to potential federal criminal prosecution for such violations and civil enforcement proceedings by the SEC.

57.   The securities that Defendants offered were not registered with the SEC, and there was no applicable exemption from registration in effect for the offering.

**C.   GIBF Collects Funds from Unaccredited Investors**

58.   As stated, GIBF made Tokens available online to the general public through its website.

59.   Interested investors could purchase Tokens directly through GIBF's website by simply following online prompts.  GIBF does nothing to verify the investors' representations as to their "accredited investor" status.  Indeed, GIBF takes no reasonable steps to verify that the investors are accredited, which, at the very least, is a requirement under the Rules promulgated under the Securities Act at 17 C.F.R. § 230.506(c).[9]

60.   Upon information and belief, as a result of its violation of 17 C.F.R. § 230.506(c), GIBF has accepted investment funds from unaccredited investors.

61.   This means that unsophisticated investors who do not have the financial discipline or wherewithal to afford a total loss of their investment in GIBF are investing funds in GIBF's Token, in direct violation of 17 C.F.R. § 230.506(c)—and in so doing, GIBF has taken advantage of less experienced, less knowledgeable lay investors.

**D.   Basile Defrauds Plaintiff**

62.    Plaintiff met Basile on June 17, 2021 at Plaintiff's residence in Los Angeles, California through a friend.  Basile was introduced as a very successful business man, who knew a lot about cryptocurrency and was designing a blockbuster project that would shortly be launched.

63.   During this June 17, 2021 meeting, Basile made the following statements

---

[9]   The underlying purpose of this provision of the Securities Act is to protect lay investors, who have a generally unsophisticated understanding of securities or securities trading, from being swindled by those with the benefit of a greater knowledge of securities trading. Also, these lay investors often do not have the expendable income to sustain losses often realized from high-risk investments.

to Assofi:

    a.  Bitcoin Latinum was a project that received $20 million from the producers of Star Trek;

    b.  Bitcoin Latinum would be a "hard fork" from Bitcoin;

    c.  Bitcoin Latinum would be interchangeable with Bitcoin;

    d.  The Bitcoin Latinum project would receive $50 million from big companies;

    e.  An investor from Dubai would put in $100 million;

    f.  The Dubai investors would open 100,000 ATMs for Bitcoin Latinum by end of 2022;

    g.  Bitcoin Latinum was the only insured cryptocurrency;

    h.  The Bitcoin Latinum project was "fully insured" by Marshall McKellan;

    i.  The Latinum coin and tokens issued to Plaintiff would be trading in early to mid-November 2021, all coins would be issued, no lockup;

    j.  All traded money will be stored in a vault;

    k.  Every time there was a transaction, the transaction fee went into Latinum, 10% goes in and builds it up; and

    l.  Coin will be released right away.  There was no "lock up" for investors.  Thus, as soon as it goes live, one could invest it, sell it and recoup the investment.

64.    Thereafter, Plaintiff met with Basile again at a Los Angeles restaurant, Il Pastaio, a couple weeks after the June 17, 2021 meeting.  Basile repeated all the statements made at the June 17 meeting and again touted the big "Bitcoin Latinum hard fork" which would result in Latinum taking over.

65.    As a further inducement for Plaintiff to invest, Basile informed him that a prominent Los Angeles hospitality group, The Hwood Group, would soon accept

1  Bitcoin Latinum at any of their establishments.

2      66.    Relying on Basile's representations, Assofi invested the sum of

3  $15,555,329 by remitting wires and cryptocurrency to the bank account(s) and wallets

4  identified by Basile and by delivering cash to Basile directly.

5      67.    As Assofi subsequently found out, none of these statements by Basile were

6  true.  Rather, Defendants and Basile personally, pocketed Assofi's funds and have

7  applied them for their own purposes.

8              **E.    Defendants' Scheme to Intentionally Defraud Investors**

9      68.    The misrepresentations made to Plaintiff were not isolated instances.

10     69.    Rather, throughout the period September 2021 through the present, GIBF

11  issued and continues to issue and publish on its website press releases that are designed,

12  at least in part, to induce investors and potential investors to invest in Tokens and to lull

13  investors and potential investors into believing that the securities that GIBF purports to

14  issue have value.

15     70.    GIBF's website, to create the appearance of credibility to potential

16  investors, claims to have entered into relationships of different forms with, *inter alia*,

17  (1) Vast Bank, (2) LBank Exchange, (3) Quavo, (4) OSO ATMs to install ATMs in the

18  United States, (5) AAX Exchange, (6) Hotbit Exchange, (7) HitBTC, (8) Changelly, (9)

19  GK8, (10) Bitmart, (11) XT.com, (12) FMFW.io, (13) DigiFinex Exchange, (14)

20  Monsoon Blockchain, (15) Crypto Climate Accord, (16) H. Wood Group, and (17)

21  CoinMarketCap. Upon information and belief, some these relationships claimed by

22  GIBF are platforms on which GIBF represented that Tokens are transferable or

23  tradeable.

24     71.    In a GIBF press release on January 10, 2022, GIBF claimed that "Latinum

25  currently trades publicly on" HitBTC, FMFW.com, Changelly, Changelly Pro, Lbank,

26  DigiFinex, Hotbit, AAX and XT.com exchanges, claiming trading volume in the

27  billions of dollars. GIBF characterizes these exchanges as platforms on which Latinum

28

Tokens are transferable or tradeable. None of these exchanges are registered as an exchange with the SEC. Upon information and belief, none of these "exchanges" are registered with any securities regulator. Moreover, upon information and belief, the contention that Tokens "trade publicly" on any or all of these platforms is materially false and misleading.

72.    GIBF also issued press releases claiming to partner with a Grammy-nominated recording artist to acquire what purports to be a non-fungible token (NFT) in "Cyber Yachts."[10] The website identified in GIBF's press release is only a colorful landing page with no information. GIBF's NFT appears to be another scheme to elicit money from the public in exchange for a bogus digital asset—and/or another front for spending ill-gotten investor funds.

73.    On or about January 25, 2022, an issuer for which GIBF CEO Basile served as Chairman and Co-Chief Executive Officer from the issuer's inception as a blank check company through the Closing of the Business Combination, and for which the CEO continues to serve as a Director, filed an S-1 Registration Statement with the SEC ("S-1"). The S-1 discloses that, "[a]s of the date of this Prospectus, the [cryptocurrency wallet] supports [25 specifically enumerated] Cryptocurrencies and other Digital Assets." The enumerated cryptocurrencies and other digital assets expressly include Bitcoin, Ethereum, USD Coin and Tether, among others. Despite the touting of Tokens by the GIBF CEO, noteworthy in its absence from the S-1 is "Bitcoin Latinum."

74.    Despite widespread representations that GIBF would release its Token and allow investors to exit from their investments, on February 26, 2022 GIBF published a

---

[10]    On November 1, 2017, the SEC published the "SEC Statement Urging Caution Around Celebrity Backed ICOs" at https://www.sec.gov/news/public-statement/statement-potentially-unlawful-promotion-icos.

1   statement that again postponed the release date of its Token – making it impossible for
2   investors to sell.[11]

3          **F.**       **GIBF Engaged in Self-Dealing to Insiders Using Ill-Gotten**
4                     **Investor Funds**

5       75.    Upon information and belief, GIBF insiders and agents spend their ill-
6   gotten gains under the guise of "advertising" GIBF's Token.

7       76.    For instance, GIBF threw a lavish "Launch Party" on September 2, 2021
8   in Hollywood California, which was attended by celebrities. Upon information and
9   belief, GIBF improperly spent investor funds to the benefit of its insiders during this
10  party—instead of utilizing any initial capital funds for legitimate business purposes.

11      77.    Likewise, GIBF hosted a party called "GENESIS," which was reported to
12  be "a massive sold-out party on Wednesday, December 1st at Mr. Jones in Miami during
13  Art Basel." This lavish party included appearances by "rap superstars" Quavo of Migos
14  and Tory Lanez. Reportedly, "[t]he exclusive, celebrity packed Bitcoin Latinum event
15  was hosted by founders Basile (Bitcoin Latinum) and Sensei Paul Misir (TapStats), and
16  joined by MMA superstar Jorge Masvidal, Paige VanZant, Anthony Pettis, 16-time
17  World Series of Poker champion Phil Hellmuth, wall street leaders, crypto whales,
18  several founders of the top cryptocurrencies, and over 40 leading Instagram model
19  influencers." "Bitcoin Latinum's star studded event dominated the Art Basel party scene,
20  as the *sky rocketing cryptocurrency* was celebrating the launch of its historic bitcoin-
21  based NFT marketplace." (emphasis added).

22      78.    Upon information and belief, this party was funded by GIBF's ill-gotten
23  gains—to which GIBF insiders were provided financial benefit and favor.

24
25
26

27         [11]     https://bitcoinlatinum.com/latinum-token-update/.

28

79.   Further, upon information and belief, GIBF has been using ill-gotten investor funds to make inappropriate purchases for its executives, board members, and insiders.

80.   Indeed, as admitted by GIBF's social media director to Assofi:



81. Indeed, a review of GIBF's financial records will reveal that it used investor funds (many of which were unaccredited investors) to make inappropriate purchases and expenditures to the benefit of GIBF insiders, as referenced above.

82. All the above activity, taken together, gives rise to the strong inference that GIBF is misappropriating investor funds.

83. Indeed, Plaintiff's money may have already been spent or converted by GIBF—as GIBF refuses to give funds back to Plaintiff, who demanded that GIBF return the funds.

**G.    "Bitcoin Latinum" is a Scam**

84. In the crypto industry, there exists a term for projects like LTNM... "shit coin." It means that a project relies on generating revenue for stakeholders through the usage of a coin or token that offers no utility at all. Often, there are red flags present that can point to a fair label of "shit coin" being applied.

85. With respect to LTNM, here are all of the "red flags," *i.e.* signifiers of a scam:

a.  Despite representations regarding the purported decentralized nature of the project, the project's infrastructure is not truly decentralized. There is a small controlling faction that governs the usage of the token. In this case, LTNM appears to market a model of centralized staking, where the centralized corporation/company/DAO possesses and owns the licensing rights to the stakers called "validators". These are known as validating nodes in other projects. The way it works is if one meets the qualifications (usually holding enough coins in your wallet), that user is allowed to stake and validate transactions on the blockchain and receives a reward in the form of coins or tokens in the project's currency.     However, in the case of LTNM, a person cannot be a validator or own a validating node. In the case of LTNM, it appears that

1      the centralized corporation, i.e. GIBF, decides who can be a validator.

2      It is not open to any anonymous person that accrues enough

3      coins/tokens to stake as would be the case in a decentralized project.

4      Defendants do not clearly explain how one gets to be a "validator."

5      Evidence of this is reflected at page 8 of the Investor Analysis:

6

7      *"From a corporate perspective, there is a mixed appetite for fully*

8      *decentralized models. As entities that must operate in environments*

9      *with low regulatory ambiguity, corporations are less deterred by more*

10     *centralized models that incorporate a reputation or membership based*

11     *validator selection model."*

12

13     *"With a Mutualized Proof of Stake (MPoS) consensus mechanism, bad*

14     *actors are economically disincentivized from hacking the LTNM*

15     *network, as all staking rewards are split between several validator*

16     *nodes. With an MPOS consensus, only validators who are authentically*

17     *interested in LTNM's network development will participate because of*

18     *the even split of staking rewards."*

19

20     *"Bitcoin Latinum's authorized validator model ensures that good*

21     *actors are elected by network participants, reducing the risk of*

22     *centralization."*

23

24     https://files.bitcoinlatinum.com/docs/thirdparty/Bitcoin%20Latinum%20Investor%20

25     Analysis.pdf (last accessed on November 17, 2022).

26     This longwinded investor statement fully omits to advise what constitutes the

27     rules for being an authorized validator. In a truly decentralized project, the sole qualifier

28

1   would be a user having a stipulated number of coins in their wallet.  This is not the case

2   with LTNM.  Indeed, if there is a limit to the number of authorized validator nodes then

3   that is another sign of a scam because control can be kept and dictated by a central

4   governing authority.

5        b. Avoiding regulatory compliance. LTNM admits to doing this in their

6           Investor Analysis on page 9: *"Bitcoin Latinum is focusing on regions*

7           *where there is precedent for the use of cryptocurrencies as*

8           *payments."* Their token is also listed on cryptocurrency exchanges that

9           do ***not*** have KYC (know your customer) requirements implemented.

10          KYC requires that crypto exchanges verify through identity

11          management mechanisms who is holding and trading crypto on their

12          exchanges. Reputable crypto exchanges adhere to, and enforce, KYC

13          guidelines. The disreputable exchanges do not have KYC because they

14          want to be able to list and trade scams and "shit coins" that the SEC or

15          FTC would otherwise pursue and halt their activity. Two such

16          exchanges are Bitmart and Hotbit. These do not have KYC

17          requirements. Notably, until recently, Hotbit purportedly listed LTNM

18          as one of the traded tokens.

19        c. Hotbit has now delisted LTNM. That is another "red flag."

20        d. "Tokenomics" data is yet another way of ascertaining whether a coin is

21          legit or amounts to a "shit coin."  LTNM tokenomics data is available

22          on page 21 of LTNM's whitepaper. 888,888,888 total coins with 80%

23          pre-mined (red flag) and "locked" in the company's "reserve." That is

24          an incredibly high amount of pre-mining and company ownership.

25          There is no clear indication of what "locked" means.  Based on the

26          information, it appears that the company can decide at any time, on a

27          whim, to unlock and sell Tokens, keeping all the profit from the sales.

28

1          e.  Closed source code.  Non-scam projects have open-source code, where
2             their coding can be viewed and verified by the public. LTNM's code is
3             private, hence, there is no way to verify the closed source code's
4             contents or activities.

5          f.  Signs of an abandoned company/project is another signifier of a scam.
6             Bitcoin Latinum's LinkedIn page shows a total of 1 employee
7             (https://www.linkedin.com/company/bitcoinlatinum/ ).  The discord
8             account has not had anyone post a message in 6 months - this is a red
9             flag for an abandoned project or a project whose team is trying to avoid
10             people. The Twitter account has not had a post in 6 months. The listed
11             address is "Palo Alto, California" (that's the whole address). There have
12             been no press releases by GIBF in a year.

13  https://files.bitcoinlatinum.com/docs/whitepaper/BitcoinLatinum-Whitepaper-v1-
14  030122.pdf (last accessed on November 17, 2022).

15        86.    In sum, this sophisticated and elaborate fraud has caused Plaintiff to invest
16  in a scam.  This action seeks to right this wrong.

17                  **FIRST CAUSE OF ACTION**
18               **Unregistered Offer and Sale of Securities**
19       **in Violation of Sections 5 and 12(a) of the Securities Act**
20            **(By Plaintiff Against All Defendants)**

21        87.    Plaintiff incorporates by reference all paragraphs above as if fully set forth
22  herein.

23        88.    Defendants (which includes Basile, GIBF and Does 1 through 10), and
24  each of them, made use of means or instruments of transportation or communication in
25  interstate commerce or of the mails, to offer or sell securities, or to carry or cause such
26  securities to be carried through the mails or interstate commerce for the purpose of sale
27  or for delivery after sale.

28

89.     The Token investment that Defendants offered and sold to Plaintiff is a security within the meaning of section 2(a)(1) of the Securities Act, 15 U.S.C. §77b(a)(1).

90.     Plaintiff purchased securities from Defendants.

91.     No registration statements have been filed with the SEC or have been in effect with respect to any securities offered by Defendants.

92.     By reason of the foregoing, each of the Defendants violated Sections 5(a), 5(c) and 12(a) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c) and 77l(a).

93.     As a direct and proximate result of Defendants' offer and sale of unregistered securities, Plaintiff has suffered damages in connection with his purchases of securities from Defendants.

## SECOND CAUSE OF ACTION

### State Law Violation for Unregistered Offer and Sale of Securities
### (By Plaintiff Against All Defendants)

94.     Plaintiff incorporates by reference all foregoing factual allegations as if fully set forth herein.

95.     The Token offering by Defendants are securities within the meaning of the California Corporations Code.

96.     Defendants, and each of them, by engaging in the conduct described above within California, directly or indirectly, sold and offered to sell securities.

97.     Plaintiff purchased securities from Defendants.

98.     No registration statements have been filed with any state or federal government entity or have been in effect with respect to the offering of securities alleged herein.

99.     By reason of the foregoing, each of the Defendants violated Sections 25110 and 25503 of the California Corporations Code.

1    100.   As a direct and proximate result of Defendants' unregistered sale of
2    securities, Plaintiff has suffered damages in connection with their purchases of
3    securities from Defendants.

4    101.   Plaintiff is entitled to damages and recovery of his attorneys' fees under
5    Section 25503 of the California Corporations Code.

6    102.   Alternatively, depending on this Court's choice-of-law decision, Plaintiff
7    is entitled to damages and his attorneys' fees under Section 73-605 of the Delaware
8    Securities Act.

9    ### THIRD CAUSE OF ACTION

10   **Securities Fraud in Violation of Section 10(b)**

11   **of the Exchange Act and Rule 10b-5**

12   **(By Plaintiff Against All Defendants)**

13   103.   Plaintiff incorporates by reference all forgoing factual allegations as
14   though fully set forth herein.

15   104.   Defendants, by engaging in the conduct described above, directly or
16   indirectly, in connection with the purchase or sale of securities, by the use of
17   instrumentalities of interstate commerce or the mails, with scienter: (a) employed
18   devices, schemes, or artifices to defraud; (b) made untrue statements of material facts
19   in order to make the statements made, in the light of the circumstances under which
20   they were made, not misleading; and (c) engaged in acts, practices or courses of
21   business which operated or would operate as a fraud or deceit upon other persons,
22   including purchasers and sellers of securities.

23   105.   The specific misrepresentations are set out in Paragraphs 63-65 above.

24   106.   Plaintiff reasonably relied upon these misrepresentations and acquired
25   securities.

26
27
28

107.   By reason of the foregoing, each of the Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b) and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

108.   As a direct and proximate result of Defendants' securities fraud, Plaintiff has suffered damages in connection with his purchases of securities from Defendants.

## FOURTH CAUSE OF ACTION

### Unregistered Dealer/Broker under Section 15(a)(1) of the Exchange Act
### (By Plaintiff Against All Defendants)

109.   Plaintiff incorporates by reference all foregoing factual allegations as if fully set forth herein.

110.   GIBF is a "dealer" as defined by Section 3(a)(4)(A), 15 U.S.C. § 78c(a)(5)(A) because it engaged in the business of selling securities (*i.e.* Tokens).

111.   Basile is a "broker" as defined by Section 3(a)(4)(A), 15 U.S.C. § 78c(a)(4)(A), because he engaged in the business of effecting transactions in securities (*i.e.* Tokens) for the account of others.

112.   By engaging in the conduct described above, Defendants, acting as brokers, made use of the mails or other means or instrumentalities of interstate commerce to effect securities transactions in, or to induce or to attempt to induce the purchase or sale of securities while not registered with the SEC as a dealer or broker or when they were not associated with an entity registered with the SEC or FINRA as a dealer.

113.   A violation of Section 15(a)(1) does not require proof of scienter.

114.   By reason of the foregoing, each of the Defendants violated Section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1).

115.   As a direct and proximate result of Defendants' securities violations, Plaintiff has suffered damages.

1

## FIFTH CAUSE OF ACTION

### State Law Securities Fraud in Violations

### (By Plaintiff Against All Defendants)

116.   Plaintiff incorporates by reference all foregoing factual allegations as if fully set forth herein.

117.   Defendants, by engaging in the conduct described above, offered or sold a security in the State of California by means of any written or oral communication that includes an untrue statement of a material fact or omits to state a material fact necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading.  The specific untrue statements of material fact made by Basile are set out in detail at Paragraphs 63-65 above and are incorporated herein by reference.

118.   By reason of the foregoing, each of the Defendants violated Section 25402 of the California Corporations Code.

119.   As a direct and proximate result of Defendants' securities fraud, Plaintiff has suffered damages in connection with his purchases of securities from Defendants.

120.   Plaintiff is entitled to recovery of damages and attorney fees under the California Corporations Code.

121.   Alternatively, depending on this Court's choice-of-law decision, Plaintiff is entitled to damages and his attorneys' fees under the Delaware Securities Act.

## SIXTH CAUSE OF ACTION

### Rescission under Section 29(b) of the Exchange Act

### (By Plaintiff Against All Defendants)

122.   Plaintiff incorporates by reference all foregoing factual allegations as if fully set forth herein.

123.   Section 15(a)(1) of the Exchange Act, 15 U.S.C. §78o(a)(1), makes it unlawful for a person to "effect a transaction in securities" or "attempt to induce the

28

COMPLAINT

1  purchase or sale of any security" unless that person is registered as a broker or dealer
2  under the rules and regulation of FINRA.

3       124.   Defendant GIBF is not a registered broker or dealer with the SEC or
4  FINRA and is not a registered investment adviser with the SEC or any state.

5       125.   Defendant Basile is not an associated person with a registered broker or
6  dealer or investment advisor.

7       126.   Section 29(b) of the Exchange Act, 15 U.S.C. §78cc(b), provides that
8  every contract made in violation of any provision of the broker-dealer registration
9  requirements "shall be void" as to rights of persons who made or engaged in the
10 performance of such contract.

11      127.   By the filing of this Complaint, Plaintiff exercises his right of rescission
12 under Section 29(b) of the Exchange Act, 15 U.S.C. §78cc(b).

13      128.   As a direct and proximate result of Defendants' charging of and receipt of
14 transaction-based compensation without being registered with the SEC  or FINRA,
15 Plaintiff has suffered damages in connection with his purchases of securities from
16 Defendants and is entitled to rescission of the contract.

17                    **SEVENTH CAUSE OF ACTION**
18                              **Fraud**
19              **(By Plaintiff Against All Defendants)**

20      129.   Plaintiff incorporates by reference all foregoing factual allegations as if
21 fully set forth herein.

22      130.   Defendant Basile on behalf of himself and GIBF made a series of
23 statements to Plaintiff.  These statements are set out in Paragraphs 63-65 above of this
24 Complaint and are incorporated herein by reference.

25      131.   Each of these statements was deliberately false or made in reckless
26 disregard of the possibility that it was false.  Basile knew that his representations about
27 Bitcoin Latinum were false.

28

1    132.   Basile intended that Plaintiff rely upon his statements and Plaintiff did, in
2    fact, reasonably and justifiably rely upon his statements.

3    133.   As a result of Basile's knowingly false statements and Plaintiff's reliance
4    thereupon, Plaintiff invested $15,555,329.

5    134.   Plaintiff has been damaged in the amount of $15,555,329.

6    135.   Defendants' wrongful acts as described herein were intentional, malicious,
7    oppressive and fraudulent, and were committed with reckless disregard of harm to
8    Plaintiff, in willful and conscious disregard of Plaintiff's rights, such that Plaintiff is
9    entitled to recover punitive and exemplary damages against Defendants in an amount
10   that is sufficient and appropriate to punish Defendants, as well as to deter them from
11   committing similar acts in the future.

12                          **EIGHTH CAUSE OF ACTION**

13                                  **Conversion**

14                      **(By Plaintiff Against All Defendants)**

15   136.   Plaintiff incorporates by reference all foregoing factual allegations as if
16   fully set forth herein.

17   137.   Plaintiff transferred a total of $15,555,329 to Defendants.

18   138.   Defendants have converted this sum in full by applying it to their own
19   purposes while giving no value to Plaintiff.

20   139.   Plaintiff has demanded his funds be returned but to no avail.

21   140.   Plaintiff has been damaged in the amount of no less than $15,555,329.

22   141.   Defendants' wrongful acts as described herein were intentional, malicious,
23   oppressive and fraudulent, and were committed with reckless disregard of harm to
24   Plaintiff, in willful and conscious disregard of Plaintiff's rights, such that Plaintiff is
25   entitled to recover punitive and exemplary damages against Defendants in an amount
26   that is sufficient and appropriate to punish Defendants, as well as to deter them from
27   committing similar acts in the future.

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NINTH CAUSE OF ACTION**

**Violation of Penal Code § 496**

**(By Plaintiff against all Defendants)**

142.   Plaintiff incorporates by reference all foregoing factual allegations as if fully set forth herein.

143.   California Penal Code § 496(a) provides that "every person who buys or receives any property that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the property to be so stolen or obtained, or who conceals, sells, withholds, or aids in concealing, selling, or withholding any property from the owner, knowing the property to be so stolen or obtained, shall be punished by imprisonment in a county jail for not more than one year, or imprisonment pursuant to subdivision (h) of Section 1170." Sub-section (c) of Penal Code § 496 instructs that "any person who has been injured by a violation of subdivision (a) or (b) may bring an action for three times the amount of actual damages, if any, sustained by the plaintiff, costs of suit, and reasonable attorney's fees."

144.   As alleged above, Defendants have converted $15,555,329 which they obtained through theft and have refused to return same. By this refusal, Defendants are unlawfully withholding those funds. Defendants received, concealed, and/or withheld the funds knowing that the funds were stolen property.

145.   Accordingly, as a result of the foregoing, Plaintiff has been damaged and is entitled to recover three times the amount of his actual damages in addition to reasonable attorneys' fees.

**PRAYER FOR RELIEF**

Plaintiff prays for judgment against Defendants as follows:

1.      For general damages according to proof;

2.      For special damages according to proof;

1        3.     For exemplary and punitive damages according to proof and in an

2  amount sufficient to punish and set an example of Defendants, and each of them;

3        4.     For an order of rescission of the investments;

4        5.     For treble damages against Defendants;

5        6.     For interest due according to proof, including but not limited to

6  prejudgment interest;

7        7.     For attorneys' fees according to proof;

8        8.     For costs of suit herein incurred; and

9        9.     For such other and further relief as the court deems just and proper.

10

11  Dated:  November 14, 2022        ROME & ASSOCIATES, A.P.C.

12

13

14                    By: _____

15                        EUGENE ROME

                          Attorneys for Plaintiff

16                      ARSHAD ASSOFI

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT

## **DEMAND FOR A JURY TRIAL**

Plaintiff hereby requests a trial by jury on all issues triable by a jury.


Dated:  November 14, 2022                              ROME & ASSOCIATES, A.P.C.


By: _____
         EUGENE ROME
Attorneys for Plaintiff
ARSHAD ASSOFI

COMPLAINT