**ROME & ASSOCIATES, A.P.C.**
Eugene Rome (SBN 232780)
erome@romeandassociates.com
Brianna Dahlberg (SBN 280711)
bdahlberg@romeandassociates.com
2029 Century Park East, Suite 450
Los Angeles, California 90067
Telephone: (310) 282-0690
Facsimile: (310) 282-0691

Attorneys for Plaintiffs
ARSHAD ASSOFI and
ASSOFI, INC.

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARSHAD ASSOFI, an individual and ASSOFI, INC., a California corporation,<br><br>        Plaintiffs,<br><br>    v.<br><br>DONALD BASILE, an individual, GIBF GP, Inc. d/b/a BITCOIN LATINUM, a Delaware corporation, GIBF GP (CAYMAN ISLANDS), LTD, a Cayman Islands corporation, MONSOON BLOCKCHAIN CORPORATION, a Delaware corporation, JDLB RITZ MIAMI LLC, a Delaware corporation, JEAN LUXE, INC., a Delaware corporation, CHRISTOPHER BASILE, an individual, JODEE LEMON, an individual, and DOES 1 through 10,<br><br>        Defendants. | Case No.: 2:22-cv-8313-GW-E<br><br>**SECOND AMENDED COMPLAINT FOR:**<br><br>(1) **UNREGISTERED OFFER AND SALE OF SECURITIES IN VIOLATION OF SECTIONS 5 AND 12(A) OF THE SECURITIES ACT**<br>(2) **STATE LAW VIOLATION FOR UNREGISTERED OFFER AND SALE OF SECURITIES**<br>(3) **SECURITIES FRAUD IN VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5**<br>(4) **UNREGISTERED DEALER/BROKER UNDER SECTION 15(A)(1) OF THE SECURITIES ACT**<br>(5) **STATE LAW SECURITIES FRAUD VIOLATIONS**<br>(6) **RESCISSION UNDER SECTION 29(B) OF THE EXCHANGE ACT**<br>(7) **FRAUD**<br>(8) **CONVERSION**<br>(9) **VIOLATION OF PENAL CODE § 496**<br>(10) **UNFAIR COMPETITION (CAL. BUS. & PROF. CODE § 17200 *ET SEQ.*)**<br>(11) **CONSTRUCTIVE FRAUDULENT TRANSFER (CAL. CIV. CODE § 3439.05)** |

1

**(12) AIDING AND ABETTING**

**[DEMAND FOR A JURY TRIAL]**

Plaintiffs ARSHAD ASSOFI ("Assofi") and ASSOFI, INC. (collectively, "Plaintiffs"), by and through their undersigned attorneys, hereby complain against Defendants DONALD BASILE ("Don Basile"), GIBF GP, Inc. d/b/a BITCOIN LATINUM ("GIBF"), GIBF GP (CAYMAN ISLANDS), LTD ("GIBF CI"), MONSOON BLOCKCHAIN CORPORATION ("Monsoon Blockchain"), JDLB RITZ MIAMI LLC ("JDLB"), JEAN LUXE, INC. ("Jean Luxe"), CHRISTOPHER BASILE ("Chris Basile"), JODEE LEMON ("Lemon"), and DOES 1 through 10 (collectively, "Defendants"), as follows:

## NATURE OF THE ACTION

1.      As stated by Gary Gensler of the Securities and Exchange Commission, the cryptocurrency market is "rife with fraud, scams and abuse." This case, resulting from the actions of Don Basile, his companies GIBF, GIBF CI, Monsoon Blockchain, JDLB, Jean Luxe, and Defendants Chris Basile and Lemon meets all three descriptions of activities perpetrated by unscrupulous individuals in the cryptocurrency space.

2.      Here, Don Basile, with aid and assistance from his various companies, employed a new and worthless token—Bitcoin Latinum—to defraud and relieve Plaintiffs of over $15 million. He did this by making a series of claims to Assofi which touted Bitcoin Latinum as the coin that would take over the crypto markets. Among other claims, Don Basile stated to Assofi that:

- Bitcoin would "hard-fork"[1] into Bitcoin Latinum
- Bitcoin Latinum would be interchangeable with Bitcoin
- Bitcoin Latinum was the only insured cryptocurrency

---

[1]      A "hard fork" refers to a radical change to the protocol of a blockchain network that effectively results in two branches, one that follows the previous protocol and one that follows the new version. In a hard fork, holders of tokens in the original blockchain will be granted tokens in the new fork as well, but miners must choose which blockchain to continue verifying. In effect, here, Basile suggested that Bitcoin Latinum would replace Bitcoin, either in full or in significant part.

- Dubai investors poured $100 million into Bitcoin Latinum
- Dubai investors would install 100,000 ATMs for Bitcoin Latinum

3.      Relying on Don Basile's statements and representations, Assofi personally or through his company Assofi, Inc., delivered or caused to be delivered, $15,555,329 (fifteen million, five-hundred fifty-five thousand, three hundred and twenty-nine dollars) to Don Basile, GIBF and/or GIBF CI.  In the end, none of the above proved true.  Instead, the plain reality of what happened with Plaintiffs' invested funds was candidly acknowledged by GIBF's head of social media who wrote Assofi the following from Bitcoin Latinum's official account:



SECOND AMENDED COMPLAINT



4.     Assofi understands, both from statements above and from industry conversations that the above is exactly what Don Basile did with money: fund a lavish lifestyle built upon his fraud. This action seeks to redress those acts.

**THE PARTIES, JURISDICTION, AND VENUE**

5.     Plaintiff Arshad Assofi is a citizen of Los Angeles County, California.

6.     Plaintiff Assofi, Inc. is a California corporation with its principal place of business located at 2005 Vista Hermosa Way, El Cajon, California 92019.

7.     Defendant Donald Basile is an individual who, at the time of the subject transactions, was a citizen of the State of California.

8.     Defendant GIBF GP, Inc. d/b/a Bitcoin Latinum (Delaware File No. 6892036) is a Delaware corporation that identifies on its Bitcoin Latinum website and in press releases that its principal place of business is 2100 Geng Road, Palo Alto,

SECOND AMENDED COMPLAINT

California 94303. A Delaware entity search reveals that GIBF GP, Inc. is a Delaware corporation, the registered agent of which is The Corporation Trust Company, located at Corporation Trust Center 1209 Orange Street, Wilmington, DE 19801, New Castle County. On information and belief, Chris Basile, Don Basile's brother, is the current Chief Executive Officer at GIBF.

9.    Defendant GIBF GP (Cayman Islands), Ltd. is a Cayman Islands corporation, with a principal place of business in the Cayman Islands. On information and belief, Chris Basile, Don Basile's brother, is the Managing Member of GIBF CI.

10.   Defendant Monsoon Blockchain Corporation is a Delaware corporation, headquartered in Palo Alto, California. A Delaware entity search reveals that Monsoon Blockchain is a Delaware corporation, the registered agent of which is The Corporation Trust Company, located at Corporation Trust Center 1209 Orange Street, Wilmington, DE 19801, New Castle County. On information and belief, Don Basile is the founder and Chief Executive Officer of Monsoon Blockchain.

11.   Defendant JDLB Ritz Miami LLC is a Delaware corporation, with a principal place of business located at 2877 Paradise Road, 702, Las Vegas, NV 89109. On information and belief, the Paradise Road address is also the current address of Don Basile. A Delaware entity search reveals that JDLB is a Delaware corporation, the registered agent of which is The Corporation Trust Company, located at Corporation Trust Center 1209 Orange Street, Wilmington, DE 19801, New Castle County.

12.   Defendant Jean Luxe, Inc. is a Delaware corporation with a principal place of business located at 2877 Paradise Road, 702, Las Vegas, NV 89109.  A Delaware entity search reveals that Jean Luxe is a Delaware corporation, the registered agent of which is The Corporation Trust Company, located at Corporation Trust Center 1209 Orange Street, Wilmington, DE 19801, New Castle County. A Florida entity search reveals that Don Basile is the Vice President of Jean Luxe with an address of 2877 Paradise Road, 702, Las Vegas, NV 89109, and Jodee Lemon is the Chairman and

President of Jean Luxe with an address of 4701 North Meridian Avenue, #601, Miami Beach, FL 33140.

13.     Defendant Jodee Lemon is an individual who, on information and belief, is a citizen of Miami Beach, Florida. On information and belief, Lemon is the Chairman and President of Jean Luxe.

14.     Defendant Christopher Basile is an individual who, on information and belief, is a citizen of Nevada or New York. On information and belief, Chris Basile is a Managing Member of GIBF CI, and Chris Basile is the current CEO of GIBF.

15.     Plaintiffs file this Second Amended Complaint and institute these proceedings to recover damages that Plaintiffs sustained arising from Defendants' unregistered offers and sales of securities in violation of sections 5, 12(a)(1) and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77e, 77l(a)(1), 77o, 78o, ("Securities Act"); section 10(b), 15 U.S.C. § 78j(b) of the Securities Exchange Act of 1934 ("Exchange Act"); and sections 25110, 25503, 25504 and 25401 of the California Corporations Code; fraud, conversion, California Penal Code violations, unfair competition pursuant to California Business & Professions Code § 17200, constructive fraudulent transfer pursuant to California Civil Code § 3439.05, and aiding and abetting. Plaintiffs further seek imposition of a constructive trust and appointment of a receiver pursuant to 28 U.S.C. § 3103.

16.     This Court has subject matter jurisdiction over the federal law claims (*i.e.* Securities Act and the Exchange Act claims and appointment of a receiver) pursuant to 28 U.S.C. § 1331. This Court has subject matter jurisdiction over the pendant state law claims pursuant to 28 U.S.C. § 1367(a).

17.     This Court has personal jurisdiction over Plaintiffs and Defendants pursuant to federal law.

18.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and/or omissions giving rise to Plaintiffs' claims occurred within this district, *inter alia*, the initial presentation of the investment opportunity was

made by Don Basile, on behalf of himself and GIBF, at Assofi's residence in Los Angeles, California.

## ALTER EGO ALLEGATIONS

19.   At all times relevant hereto, GIBF and Don Basile were alter egos of each other and there existed a unity of interest and ownership between GIBF and Don Basile such that the separateness of the two companies never existed.  Indeed, when Don Basile requested that Assofi deliver funds to him for investment in GIBF, he often requested cash over which he took personal possession. All of the acts and omissions described in this Second Amended Complaint by any defendant were duly performed by, and attributable to, all defendants, each acting as agent, employee, alter ego and/or under the direction and control of the others, and such acts and omissions were within the scope of such agency, employment, alter ego, direction, and/or control. Denying the unity of interest between GIBF and Don Basile and adhering to the fiction of the separate existence between them would result in fraud and inequity to Plaintiffs. Any reference in this Second Amended Complaint to any acts of defendants shall be deemed to be the acts of each defendant acting individually, jointly, or severally.

20.   The true names and capacities, whether corporate, associate, individual, partnership or otherwise of defendants Does 1 through 10, inclusive, are unknown to Plaintiffs, and Plaintiffs will therefore sue said defendants by such fictitious names. Plaintiffs will seek leave of court to further amend this Second Amended Complaint to allege their true names and capacities when the same are ascertained.

## GENERAL ALLEGATIONS

### A.   GIBF's Sale of Tokens to the Public

21.   In November of 2020, GIBF announced it planned to release for purchase to the general public a Token that it claims is a cryptocurrency, which unlike fiat currency, is created, distributed, traded, and stored with the use of an online ledger system known as a blockchain.

22.     By at least early 2021, GIBF was actively selling "Pre-Sale Tokens" directly through its website to U.S. residents.

23.     These Pre-Sale Tokens could be purchased by anyone through GIBF's website.

24.     Based on GIBF's press releases, GIBF claims that it made Pre-Sale Tokens available for limited periods of time, in at least three waves of public offerings since 2020.

25.     Indeed, on GIBF's home page, there were two separate "buttons" that read "Buy Tokens." A website user need only navigate through the online prompts to invest funds.

26.     Although GIBF allowed the general public to purchase its pre-sale Tokens through its website—an option typically reserved for founders or early accredited investors—it had not released the Tokens for trading (*i.e.*, disbursed any Tokens to its crypto-wallet).[2]

27.     Instead, GIBF announced that its Tokens would be released to investor crypto-wallets at a specific date (akin to an ICO/IPO) unilaterally determined by GIBF in its sole discretion.

28.     At first, GIBF promised that its Token would be available for trading in October of 2021.

29.     Then, GIBF told investors that the Token would be available in early 2022.

30.     Now, GIBF claims the Token will be available in early 2023.

31.     To date, GIBF has not released any Tokens to investor crypto-wallets.

32.     In addition to purchasing Tokens through GIBF's website, GIBF listed its Token on what it claims to be public exchanges—which are not regulated by the SEC.

---

[2]     GIBF launched a crypto-wallet that was supposed to give its investors the ability to view their account balances and trade Latinum's Token on digital exchanges. GIBF's crypto-wallet was made available for download on the Google Play Store™ and Apple App Store™, and had over 500 downloads, which demonstrates the breadth of investors to which this fraudulent scheme has reached.

33.     Upon information and belief, GIBF's Token—LTNM—is not at all what it purports to be—as detailed below, the technological overpromises, the manner in which it engaged in fundraising from the public, and the repeatedly delayed release date gives rise to the inference that GIBF touted and sold a Token that has not yet been developed (by Monsoon Blockchain) and/or lacks the capabilities represented to investors.

### B.     Latinum's Tokens—LTNM—are Securities Subject to the Securities Act's Registration Requirement

34.     At the outset, GIBF's own documents utilized in connection with sales transactions confirm that its Token is a security within the meaning of the Securities Act of 1933: "[T]his SAFT is a security that has not been registered under the Securities Act . . . [and] will not be registered under the Securities Act of 1933, and may not be offered or sold in the United States absent registration or an applicable exemption from the registration requirements." *See* Simple Agreement of Future Tokens ("SAFT") attached hereto as Exhibit A, §§ 2.4(a) & 5(b); Exhibit B, §§ 2.4(a) & 5(b); Exhibit C, §§ 2.4(a) & 5(b); Exhibit D, §§ 2.4(a) & 5(b); and Exhibit E, §§ 2.4(a) & 5(b).[3] Chris Basile is the signatory to the SAFTs, executed on behalf of GIBF.

35.     Yet, GIBF claims that its Token is a cryptocurrency like Bitcoin. But, to the extent GIBF's Token even exists, GIBF's claimed Token features are a radical departure from Bitcoin's decentralized cryptocurrency model.[4]

---

[3]     In connection with each of Plaintiffs' five transfers, Defendants created SAFTs to memorialize the transactions; however, only two of the five SAFTs were signed by Assofi. The remaining three SAFTs remain unexecuted. To the extent the SAFTs were signed, they are void because they were induced by fraud and because they were made in violation of Section 15(a)(1) of the Exchange Act, 15 U.S.C. §78o(a)(1), and other law. *See* Sixth and Seventh Causes of Action, *infra*.

[4]     For instance, Bitcoin is run by unaffiliated entities known as "miners," who are competing to validate transactions and enter them on the digital ledger. They are competing because, if successful, they will be rewarded with newly generated Bitcoin. This methodology is called "proof-of-work." Latinum, on the other hand, purports to utilize a modified "proof-of-stake," system, which is not decentralized as it is subject to "pre-mining" and Latinum's control.

36.     Notably, GIBF's press releases often cite to Bitcoin's stability and growth as an indicator that its own Token will be similarly accepted by the cryptocurrency community, which is materially false and misleading.

37.     Unlike Bitcoin, GIBF's Token displays all the characteristics of a security, and more specifically an investment contract, as defined under the Securities Act and by the United States Supreme Court in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) ("*Howey*").

38.     In *Howey*, the Court developed what is known as the "*Howey* test" to evaluate whether certain transactions qualify as "investment contracts" under the Securities Act.  Under the *Howey* test, a transaction is an investment contract if: (1) it is an investment of money; (2) there is an expectation of profits from the investment; (3) the investment of money is in a common enterprise; and (4) any profit comes from the efforts of a promoter or a third party.

39.     The first prong of the *Howey* test is typically satisfied in an offer and sale of a cryptocurrency because the cryptocurrency is purchased or otherwise acquired in exchange for value, whether in the form of currency or other consideration.

40.     Assofi in this matter engaged in transactions with Defendants Don Basile, GIBF and/or GIBF CI, by which Assofi either personally or through his company Assofi, Inc., delivered or caused to be delivered to Defendants Don Basile, GIBF or GIBF CI approximately $15 million in U.S. currency in exchange for Tokens.

41.     Further, in evaluating digital assets or cryptocurrencies, courts have typically found that a "common enterprise" exists.

42.     In this matter, the "common enterprise" is GIBF and/or GIBF CI.

43.     The main issues in analyzing a digital asset or cryptocurrency under the *Howey* test are typically whether there is an expectation of profits from the investment and whether those profits come from the effort of a promoter or third party.

44.     When a reasonable expectation of profits exists, the investment is more likely to qualify as a security.

45.     In determining whether a reasonable expectation of profits exists, the United States Securities and Exchange Commission ("SEC") has issued guidance stating that, the more of the following characteristics that are present, the more likely it is that there is a reasonable expectation of profit:

a.  The digital asset gives the holder rights to share in the enterprise's income or profits or to realize gain from capital appreciation of the digital asset;

b.  The digital asset is transferable or traded on or through a secondary market or platform, or is expected to be in the future;

c.  Purchasers would reasonably expect that a promoter or third party's efforts would result in capital appreciation of the digital asset and therefore be able to earn a return on their purchase.

d.  The digital asset is offered broadly to potential purchasers as compared to being targeted to expected users of the goods or services or those who have a need for the functionality of the asset;

e.  There is little apparent correlation between the offering price of the digital asset and the market price of the particular goods or services that can be acquired in exchange for the digital asset;

f.  A promoter or third party has raised an amount of funds in excess of what may be needed to establish a functional network or digital asset;

g.  A promoter or third party is able to benefit as a result of holding the same class of digital assets as those being distributed to the public;

h.  A promoter or third party continues to expend funds from proceeds or operations to enhance the functionality or value of the network or digital asset; and

i.  The digital asset is marketed, directly or indirectly, using the expertise of a promoter or third party, based on the future (and not present) functionality of the digital asset, based on promises to build a business

or operation versus currently available goods, and promising appreciation in value.

46. Defendants Don Basile and GIBF (which operates the https://bitcoinlatinum.com website) provided information to and enticed Assofi to invest in Tokens with an expectation of profits. Specifically:

 a. GIBF's website advertises itself as the "next-generation Bitcoin blockchain-based token, capable of massive transaction volume, digital asset management, cybersecurity, and transaction capacity." GIBF's website further states "Bitcoin Latinum asset backing is held in a fund model so that base asset value increases over time. It accelerates this asset back funds growth by depositing 80% of the transaction fee back into the asset fund."

 b. GIBF's website offered its Tokens for "Pre-Sale" to the general public.

 c. GIBF's website advertises that the Token is currently listed on crypto exchanges under the ticker "LTNM."

 d. GIBF purports to target the "Media, Gaming, Cloud Computing, and Telecommunications Industries."

 e. GIBF's website provides a "Bitcoin Latinum Investor Analysis," a "Bitcoin Latinum Investor Overview," and a "Bitcoin Latinum Whitepaper," which includes projections, risks and mitigating factors, competition, and other indicia of a prospectus or private placement memorandum.

 f. Don Basile personally represented to Assofi that all proceeds from sale of Latinum will be stored in a vault; every time there was a transaction, the transaction fee of some 10% would "go into Latinum" and build up value.

47. In evaluating whether any profit comes from the efforts of a promoter or third party, the SEC issued guidance stating that the inquiry into whether a purchaser is

relying on the efforts of others focuses on two key issues: (1) does the purchaser reasonably expect to rely on the efforts of a promoter or third party; and (2) are those efforts undeniably significant ones (including the essential managerial efforts which affect the failure or success of the enterprise) as opposed to efforts that are more ministerial in nature.

48.    If a digital asset has the aforementioned characteristics, then it is highly likely that the SEC will consider it to be a security subject to the SEC's registration requirements. Indeed, it appears that the SEC views most cryptocurrencies as securities, and GIBF projects all such hallmarks of a security.

49.    Plaintiffs reasonably expected to rely on the efforts of GIBF, and those efforts of GIBF were undeniably significant (*i.e.*, essential managerial efforts which affect the failure or success of the enterprise).

50.    Applying the *Howey* test, an investment in Tokens is considered an investment contract – *i.e.*, a security.[5]

51.    Indeed, significantly, on September 15, 2022, SEC Chairman Gary Gensler stated that, in his opinion, staking-based cryptocurrencies that use the "proof-of-stake" system—which is the system that Latinum will purportedly use—are "very likely securities that [pass the *Howey* test and] should be regulated by the agency [*i.e.*, the SEC]." [6]

52.    Section 5(a) of the Securities Act (15 U.S.C. § 77e(a)) provides that, unless a registration statement is in effect as to a security or an exemption from registration applies, then it is unlawful for any person, directly or indirectly, to offer and sell securities in interstate commerce.

53.    Section 5(c) of the Securities Act (15 U.S.C. § 77e(c)) provides a similar prohibition against offers to sell (or offers to buy) unless a registration statement is on

---

[5]    See *Diamond Fortress Techs., Inc. v. EverID, Inc.*, 274 A.3d 287 (Del. 2022).

[6]    https://qz.com/ethereum-s-merge-may-put-it-in-the-sec-s-crosshairs-1849557858

file and in effect with the SEC.  Sections 5(a) and 5(c) of the Securities Act prohibit the offer or sale of unregistered securities in interstate commerce absent an applicable exemption.

54.     Defendants did not register the Token with the SEC.[7]  Nor did GIBF file a Notice of Exempt Offering on Form D with the Securities and Exchange Commission, which is a "safe harbor" notice of reliance and exemption from SEC registration requirements.  Nor have Defendants Don Basile or GIBF filed any required notice of exempt securities offerings with any state securities regulator.

55.     In fact, as stated above, GIBF's own documents, agreements, and investment contracts admit that its Tokens are securities within the meaning of the Securities Act of 1933 and that the Tokens are unregistered and subject to prohibition from sale in the United States.

56.     Further, Don Basile, has publicly characterized GIBF's Token as an "asset backed security." [8] Don Basile also states that "we need [] people to be able to see that it is going to grow over time . . . Latinum [is] based upon the idea of an underlying trust fund . . . the value of the currency increases the more it is used, it is a true network affect currency where its value is exponentially increased as the adoption increases." [9]

57.     Rule 506 of Regulation D makes exemptions under Regulation D, Regulation A+ and Regulation CF unavailable for any securities offering in which certain "felons" or other "bad actors" are involved. The disqualification provisions in Rule 506(d) prohibit issuers or other "covered persons" from participating in Rule 506 offerings, if they have been convicted of a felony, or are subject to court or administrative sanctions for securities fraud or other violations of specified laws.

---

[7]      *See* publicly available EDGAR system, at https://www.sec.gov/edgar/search-and-access; *see also Jonna v. Bitcoin Latinum*, Case No. 2:22-cv-10208-LJM-JJCG (E.D. Mich) ECF No. 44, at ¶¶ 31, 130 (Latinum admitting this).

[8]      https://www.sec.gov/Archives/edgar/data/1823144/000110465921108086/tm2125626d1_defa14a.htm.

[9]      *Id.*

58.     A "covered person" includes, but is not limited to, the issuer, affiliated issuers, directors and officers of the issuer, promoters, and any person that has been or will be paid (directly or indirectly) remuneration for solicitation of purchasers in connection with such sale of securities.

59.     Under Regulation D, Regulation A+ or Regulation CF, a disqualification from the use of the applicable exemption occurs if (1) a covered person is involved in the offering, (2) that covered person is subject to one or more of the relevant disqualifying events and (3) the disqualifying event occurs within the lookback period provided by the regulation.

60.     Plaintiffs are informed by the allegations set forth in a separate case entitled *Raymond Jonna v. Kevin Jonna and Bitcoin Latinum, et al.*, United States District Court for the Eastern District of Michigan Case No. 2:22-cv-10208-RHC-JJCG that Defendants employ at least one promoter and solicitor of GIBF who offered and sold the Tokens as a "control person" as defined in Rule 506(d).  Plaintiffs are further informed that this control person is subject to a disqualifying event under Rule 506(d). As such, Defendant GIBF is prohibited from utilizing the exemptions from registration available under Regulation D, Regulation A+ and Regulation CF.

61.     At all relevant times, none of the Defendants and third parties were registered as broker-dealers with the SEC or with the Financial Industry Regulatory Authority ("FINRA") or associated with a registered broker-dealer.

62.     An unregistered person or entity who receives or facilitates transaction-based compensation for the sale of a security violates section 15(a)(1) of the Exchange Act, 15 U.S.C. §78o(a)(1).

63.     Persons who knowingly violate provisions of the Securities Act and the Exchange Act are subject to potential federal criminal prosecution for such violations and civil enforcement proceedings by the SEC.

64.     Indeed, the SEC and the Department of Justice ("DOJ") have been recently cracking down on crimes related to cryptocurrency, particularly with regard to

SECOND AMENDED COMPLAINT

unregistered offerings and fraud. *See*, *e.g.*, *Securities and Exchange Commission v. Mauricio Chavez, et al.*, No. 4:22-cv-03359 (S.D. Tex. filed September 19, 2022); *Securities and Exchange Commission v. Chicago Crypto Capital LLC, et al.*, No. 1:22-cv-04975 (N.D. Ill. filed September 14, 2022); *Securities and Exchange Commission v. Dragonchain, Inc., Dragonchain Foundation, The Dragon Company, John Joseph Roets*, No. 2:22-cv-01145 (W.D. Wa. filed August 16, 2022); *Securities and Exchange Commission v. Steven Chiang a/k/a Cyrus Kong, Eric Tippetts, James Hardy, and Maurice "Butch" Chelliah*, No. 22-cv-0600-TWR-WVG (S.D. Cal. filed April 28, 2022); *Securities and Exchange Commission v. Block Bits Capital, LLC, Block Bits Capital GP I, LLC and Japheth Dillman, Civ. Action*, o. 3:22-cv-02563 (N.D. Cal. Filed April 27, 2022); *Securities and Exchange Commission v. David B. Mata, Civ. Action*, o. 3:22-cv-02565 (N.D. Cal. Filed April 27, 2022).[10] On October 6, 2021, the DOJ announced the creation of the National Cryptocurrency Enforcement team.[11] And the DOJ recently asked Congress to allow longer sentence, anti-tipoff extensions, and longer statute of limitations, broader venue/jurisdictional rules for crimes involving digital assets.[12]

65.     Here, the securities that Defendants Don Basile and GIBF and/or GIBF CI offered were not registered with the SEC, and there was no applicable exemption from registration in effect for the offering thus violating both the Securities Act and the Exchange Act.

---

[10] *See also* https://www.justice.gov/opa/pr/ceo-titanium-blockchain-pleads-guilty-21-million-cryptocurrency-fraud-scheme; https://www.justice.gov/usao-sdfl/pr/three-men-charged-100-million-cryptocurrency-fraud; https://www.justice.gov/opa/pr/two-estonian-citizens-arrested-575-million-cryptocurrency-fraud-and-money-laundering-scheme; https://www.justice.gov/opa/pr/investment-manager-arrested-10-million-cryptocurrency-ponzi-scheme; https://www.justice.gov/criminal-vns/case/united-states-v-le-ahn-tuan; https://www.justice.gov/opa/pr/justice-department-announces-enforcement-action-charging-six-individuals-cryptocurrency-fraud.

[11] https://www.justice.gov/opa/pr/deputy-attorney-general-lisa-o-monaco-announces-national-cryptocurrency-enforcement-team.

[12] https://www.pymnts.com/cryptocurrency/2022/justice-department-seeks-congressional-green-light-for-faster-crypto-investigations.

## C.   GIBF Collects Funds from Unaccredited Investors

66.   GIBF made Tokens available online to the general public through its website.

67.   Interested investors could purchase Tokens directly through GIBF's website by simply following online prompts.  GIBF does nothing to verify the investors' representations as to their "accredited investor" status.  Indeed, GIBF takes no reasonable steps to verify that the investors are accredited, which, at the very least, is a requirement under the Rules promulgated under the Securities Act at 17 C.F.R. § 230.506(c).[13]

68.   Upon information and belief, as a result of its violation of 17 C.F.R. § 230.506(c), GIBF has accepted investment funds from unaccredited investors.

69.   This means that unsophisticated investors who do not have the financial discipline or wherewithal to afford a total loss of their investment in GIBF are investing funds in GIBF's Token, in direct violation of 17 C.F.R. § 230.506(c)—and in so doing, GIBF has taken advantage of less experienced, less knowledgeable lay investors.

## D.   Don Basile Defrauds Plaintiffs

70.   Assofi met Don Basile on June 17, 2021, at Assofi's residence in Los Angeles, California through a friend. Don Basile was introduced as a very successful businessman, who knew a lot about cryptocurrency and was designing a blockbuster project that would shortly be launched.

71.   During this June 17, 2021, meeting, Don Basile made the following statements to Assofi:

> a.   Bitcoin Latinum was a project that received $20 million from the producers of Star Trek;

---

[13]   The underlying purpose of this provision of the Securities Act is to protect lay investors, who have a generally unsophisticated understanding of securities or securities trading, from being swindled by those with the benefit of a greater knowledge of securities trading. Also, these lay investors often do not have the expendable income to sustain losses often realized from high-risk investments.

b. Bitcoin Latinum would be a "hard fork" from Bitcoin;

c. Bitcoin Latinum would be interchangeable with Bitcoin;

d. The Bitcoin Latinum project would receive $50 million from big companies;

e. An investor from Dubai would put in $100 million;

f. The Dubai investors would open 100,000 ATMs for Bitcoin Latinum by end of 2022;

g. Bitcoin Latinum was the only insured cryptocurrency;

h. The Bitcoin Latinum project was "fully insured" by Marshall McKellan;

i. The Latinum coin and tokens issued to Plaintiff would be trading in early to mid-November 2021, all coins would be issued, no lockup;

j. All traded money will be stored in a vault;

k. Every time there was a transaction, the transaction fee went into Latinum, 10% goes in and builds it up; and

l. Coin will be released right away.  There was no "lock up" for investors.  Thus, as soon as it goes live, one could invest it, sell it and recoup the investment.

72.    Thereafter, Assofi met with Don Basile again at a Los Angeles restaurant, Il Pastaio, a couple weeks after the June 17, 2021, meeting.  Don Basile repeated all the statements made at the June 17 meeting and again touted the big "Bitcoin Latinum hard fork" which would result in Latinum taking over.

73.    As a further inducement for Plaintiffs to invest, Don Basile informed Assofi that a prominent Los Angeles hospitality group, The H.Wood Group, would soon accept Bitcoin Latinum at any of their establishments.

74.    Relying on Don Basile's representations, Assofi invested the sum of $15,555,329 by remitting, or causing to be remitted, wires and cryptocurrency to the bank account(s) and wallets identified by Don Basile, including those of GIBF and/or

18

GIBF CI, and by delivering cash to Don Basile directly.[14]

75.     As Assofi subsequently found out, none of these statements by Don Basile were true.  Rather, GIBF, GIBF CI, and Don Basile personally, pocketed Plaintiffs' funds and have applied them for their own personal use.

76.     GIBF expressly admitted that Bitcoin Latinum was a scam through a series of text messages (sent and then "unsent") from Defendants' director of social media from GIBF's official account, conveying to Assofi in no uncertain terms that Don Basile had stolen his money and that Assofi had been "robbed". [15]



<hr />

[14] GIBF CI is one of the companies listed on certain of the SAFTs at issue in this case, and GIBF CI is a party to the Bitcoin Latinum Token Option Agreement executed by Chris Basile in his capacity as GIFB CI's Managing Member. Notably, Chris Basile is also the signatory to the SAFTs executed on behalf of GIBF. Thus, on information and belief, Plaintiffs' payments either went to GIBF whereupon the funds were routed to GIBF CI, or payments went directly to GIBF CI.

[15] For a more complete record of text messages Assofi received from GIBF's official account, *see* Exhibit F.



SECOND AMENDED COMPLAINT

1

### E.   Don Basile's Scheme to Intentionally Defraud Investors

2   77.   The misrepresentations made to Assofi were not isolated instances.

3   78.   Rather, throughout the period September 2021 through early 2022, GIBF

4   issued press releases that are designed, at least in part, to induce investors and potential

5   investors to invest in Tokens and to lull investors and potential investors into believing

6   that the securities that GIBF purports to issue have value.

7   79.   GIBF's website, to create the appearance of credibility to potential

8   investors, claims to have entered into relationships of different forms with, *inter alia*,

9   (1) Vast Bank, (2) LBank Exchange, (3) Quavo, (4) OSO ATMs to install ATMs in the

10   United States, (5) AAX Exchange, (6) Hotbit Exchange, (7) HitBTC, (8) Changelly, (9)

11   GK8, (10) Bitmart, (11) XT.com, (12) FMFW.io, (13) DigiFinex Exchange, (14)

12   Monsoon Blockchain, (15) Crypto Climate Accord, (16) The H.Wood Group, and (17)

13   CoinMarketCap. Upon information and belief, some these relationships claimed by

14   GIBF are platforms on which GIBF represented that Tokens are transferable or

15   tradeable.

16   80.   In a GIBF press release on January 10, 2022, GIBF claimed that "Latinum

17   currently trades publicly on" HitBTC, FMFW.com, Changelly, Changelly Pro, Lbank,

18   DigiFinex, Hotbit, AAX and XT.com exchanges, claiming trading volume in the

19   billions of dollars. GIBF characterizes these exchanges as platforms on which Latinum

20   Tokens are transferable or tradeable. None of these exchanges are registered as an

21   exchange with the SEC. Upon information and belief, none of these "exchanges" are

22   registered with any securities regulator. Moreover, upon information and belief, the

23   contention that Tokens "trade publicly" on any or all of these platforms is materially

24   false and misleading.

25   81.   GIBF also issued press releases claiming to partner with a

26   Grammy-nominated recording artist to acquire what purports to be a non-fungible token

27

28

SECOND AMENDED COMPLAINT

(NFT) in "Cyber Yachts."[16]  The website identified in GIBF's press release is only a colorful landing page with no information. GIBF's NFT appears to be another scheme to elicit money from the public in exchange for a bogus digital asset—and/or another front for spending ill-gotten investor funds.

82.     On or about January 25, 2022, an issuer for which GIBF CEO Don Basile served as Chairman and Co-Chief Executive Officer from the issuer's inception as a blank check company through the Closing of the Business Combination, and for which the CEO continues to serve as a Director, filed an S-1 Registration Statement with the SEC ("S-1"). The S-1 discloses that, "[a]s of the date of this Prospectus, the [cryptocurrency wallet] supports [25 specifically enumerated] Cryptocurrencies and other Digital Assets." The enumerated cryptocurrencies and other digital assets expressly include Bitcoin, Ethereum, USD Coin and Tether, among others. Despite the touting of Tokens by the GIBF CEO, noteworthy in its absence from the S-1 is "Bitcoin Latinum."

83.     Despite widespread representations that GIBF would release its Token and allow investors to exit from their investments, on February 26, 2022, GIBF published a statement that again postponed the release date of its Token—making it impossible for investors to sell.[17]

## F.     GIBF Engaged in Self-Dealing to Insiders Using Ill-Gotten Investor Funds

84.     Upon information and belief, GIBF insiders and agents spend exorbitant amounts of their ill-gotten gains under the guise of "advertising" GIBF's Token.

85.     For instance, GIBF threw a lavish "Launch Party" on September 2, 2021, in Hollywood California, which was attended by celebrities.  Upon information and

---

[16]     On November 1, 2017, the SEC published the "SEC Statement Urging Caution Around Celebrity Backed ICOs" at https://www.sec.gov/news/public-statement/statement-potentially-unlawful-promotion-icos.

[17]     https://bitcoinlatinum.com/latinum-token-update/.

1  belief, GIBF improperly spent investor funds to the benefit of its insiders during this
2  party—instead of utilizing any initial capital funds for legitimate business purposes.

3      86.     Likewise, GIBF hosted a party called "GENESIS," which was reported to
4  be "a massive sold-out party on Wednesday, December 1st at Mr. Jones in Miami during
5  Art Basel." This lavish party included appearances by "rap superstars" Quavo of Migos
6  and Tory Lanez. Reportedly, "[t]he exclusive, celebrity packed Bitcoin Latinum event
7  was hosted by founders Basile (Bitcoin Latinum) and Sensei Paul Misir (TapStats), and
8  joined by MMA superstar Jorge Masvidal, Paige VanZant, Anthony Pettis, 16-time
9  World Series of Poker champion Phil Hellmuth, wall street leaders, crypto whales,
10  several founders of the top cryptocurrencies, and over 40 leading Instagram model
11  influencers." "Bitcoin Latinum's star studded event dominated the Art Basel party scene,
12  as the *sky rocketing cryptocurrency* was celebrating the launch of its historic bitcoin-
13  based NFT marketplace." (emphasis added).

14      87.     Upon information and belief, this party was funded by GIBF's ill-gotten
15  gains—to which GIBF insiders were provided financial benefit and favor.

16      88.     Upon further information and belief, the funds that Plaintiffs and others
17  invested in the Token were received by GIBF and/or GIBF CI and funneled to Monsoon
18  Blockchain, another of Don Basile's companies of which Don Basile is the founder and
19  CEO and Chris Basile is a principal. On information and belief, a substantial part—if
20  not the overwhelming bulk—of funds invested into GIBF's Token were transferred to
21  Monsoon Blockchain in exchange for non-existent or purported services provided at
22  exorbitant prices under the pretense that such fees were vendor payments; however,
23  such funds were not spent on vendor services, but rather, Don Basile distributed the
24  funds from Monsoon Blockchain to even more of Don Basile's companies with no
25  benefit to GIBF.

26      89.     Upon information and belief, whether directly or indirectly through
27  Monsoon Blockchain and/or other of Don Basile's companies—companies fully
28  controlled and operated by Don Basile and/or owned and operated by Don Basile's

aiders and abettors—Plaintiffs' and other investors' funds were transferred in part or in whole for personal use, rather than for GIBF's business purposes.

90.     Upon further information and belief, GIBF has been using ill-gotten investor funds to make inappropriate purchases for its executives, board members, and insiders.

91.     Indeed, upon information and belief, Plaintiffs' funds either through Monsoon Blockchain or through another of Don Basile's shell companies, or through GIBF and/or GIBF CI directly, were transferred to Jean Luxe and/or JGLB.

92.     Jean Luxe and JGLB are both entities owned and/or operated by Don Basile or close friends and family. For example, Don Basile is the Vice President of Jean Luxe, and Lemon, Don Basile's current or former romantic partner, is the Chairman and President of Jean Luxe.

93.     On information and belief, Don Basile transferred Plaintiffs' (and other investors') funds into JGLB and Jean Luxe to finance lavish expenses, including but not limited to, a luxury condominium with an address of 4701 N. Meridian Avenue, #601, Miami Beach, FL 33140, Lemon's current address. The condominium is currently held in the name of JGLB, and its listed value is $8 million.

94.     Indeed, as admitted by GIBF's social media director to Assofi:

SECOND AMENDED COMPLAINT



95.   A review of GIBF's financial records will reveal that it used investor funds (many of which were unaccredited investors) to make lavish purchases and expenditures to the benefit of GIBF insiders, as referenced above.

96.     All the above activity, taken together, gives rise to the strong inference that GIBF is misappropriating investor funds.

97.     Indeed, Plaintiffs' money may have already been spent or converted by GIBF—as GIBF refuses to give funds back to Plaintiffs, who demanded that GIBF return the funds.

### G.     "Bitcoin Latinum" is a Scam

98.     In the crypto industry, there exists a term for projects like LTNM: "s*** coin." It means that a project relies on generating revenue for stakeholders through the usage of a coin or token that offers no utility at all. Often, there are red flags present that can point to a fair label of "s*** coin" being applied.

99.     With respect to LTNM, here are all of the "red flags," *i.e.* signifiers of a scam:

  a.  Despite representations regarding the purported decentralized nature of the project, the project's infrastructure is not truly decentralized. There is a small controlling faction that governs the usage of the token. In this case, LTNM appears to market a model of centralized staking, where the centralized corporation/company/DAO possesses and owns the licensing rights to the stakers called "validators". These are known as validating nodes in other projects. The way it works is if one meets the qualifications (usually holding enough coins in your wallet), that user is allowed to stake and validate transactions on the blockchain and receives a reward in the form of coins or tokens in the project's currency. However, in the case of LTNM, a person cannot be a validator or own a validating node. In the case of LTNM, it appears that the centralized corporation, *i.e.*, GIBF, decides who can be a validator. It is not open to any anonymous person that accrues enough coins/tokens to stake as would be the case in a decentralized project.

Defendants do not clearly explain how one gets to be a "validator." Evidence of this is reflected at page 8 of the Investor Analysis:

*"From a corporate perspective, there is a mixed appetite for fully decentralized models. As entities that must operate in environments with low regulatory ambiguity, corporations are less deterred by more centralized models that incorporate a reputation or membership based validator selection model."*

*"With a Mutualized Proof of Stake (MPoS) consensus mechanism, bad actors are economically disincentivized from hacking the LTNM network, as all staking rewards are split between several validator nodes. With an MPOS consensus, only validators who are authentically interested in LTNM's network development will participate because of the even split of staking rewards."*

*"Bitcoin Latinum's authorized validator model ensures that good actors are elected by network participants, reducing the risk of centralization."*

https://files.bitcoinlatinum.com/docs/thirdparty/Bitcoin%20Latinum%20Investor%20Analysis.pdf (last accessed on November 17, 2022).

This longwinded investor statement fully omits to advise what constitutes the rules for being an authorized validator. In a truly decentralized project, the sole qualifier would be a user having a stipulated number of coins in their wallet. This is not the case with LTNM. Indeed, if there is a limit to the number of authorized validator nodes then that is another sign of a scam because control can be kept and dictated by a central governing authority.

b. Avoiding regulatory compliance. LTNM admits to doing this in their Investor Analysis on page 9: *"Bitcoin Latinum is focusing on regions where there is precedent for the use of cryptocurrencies as payments."* Their token is also listed on cryptocurrency exchanges that do ***not*** have KYC (know your customer) requirements implemented. KYC requires that crypto exchanges verify through identity management mechanisms who is holding and trading crypto on their exchanges. Reputable crypto exchanges adhere to, and enforce, KYC guidelines. The disreputable exchanges do not have KYC because they want to be able to list and trade scams and "s*** coins" that the SEC or FTC would otherwise pursue and halt their activity. Two such exchanges are Bitmart and Hotbit. These do not have KYC requirements. Notably, until recently, Hotbit purportedly listed LTNM as one of the traded tokens.

c. Hotbit has now delisted LTNM. That is another "red flag."

d. "Tokenomics" data is yet another way of ascertaining whether a coin is legit or amounts to a "s*** coin." LTNM tokenomics data is available on page 21 of LTNM's whitepaper. 888,888,888 total coins with 80% pre-mined (red flag) and "locked" in the company's "reserve." That is an incredibly high amount of pre-mining and company ownership. There is no clear indication of what "locked" means. Based on the information, it appears that the company can decide at any time, on a whim, to unlock and sell Tokens, keeping all the profit from the sales.

e. Closed source code. Non-scam projects have open-source code, where their coding can be viewed and verified by the public. LTNM's code is private, hence, there is no way to verify the closed source code's contents or activities.

f. Signs of an abandoned company/project is another signifier of a scam.

28

Bitcoin Latinum's LinkedIn page shows a total of one employee (https://www.linkedin.com/company/bitcoinlatinum/ ). The discord account has not had anyone post a message in 6 months. This is a red flag for an abandoned project or a project whose team is trying to avoid people. The Twitter account has not had a post in 6 months. There have been no press releases by GIBF in a year.

https://files.bitcoinlatinum.com/docs/whitepaper/BitcoinLatinum-Whitepaper-v1-030122.pdf (last accessed on November 17, 2022).

100.  In sum, this sophisticated and elaborate fraud has caused Plaintiffs to invest in a scam.  This action seeks to right this wrong.

## FIRST CAUSE OF ACTION

### Unregistered Offer and Sale of Securities

### in Violation of Sections 5 and 12(a) of the Securities Act

### (By Plaintiffs Against Defendants Don Basile, GIBF, Chris Basile, and GIBF CI)

101.  Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein.

102.  Defendants Don Basile, GIBF, Chris Basile, and GIBF CI made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer or sell securities, or to carry or cause such securities to be carried through the mails or interstate commerce for the purpose of sale or for delivery after sale.

103.  The Token investment that Defendants offered and sold  to  Plaintiffs  is a  security  within  the  meaning  of  section 2(a)(1) of the Securities Act, 15 U.S.C. §77b(a)(1).

104.  Plaintiffs purchased securities from Don Basile, GIBF, Chris Basile, and/or GIBF CI.

105.  No registration statements have been filed with the SEC or have been in effect with respect to any securities offered by these Defendants.

106.   By reason of the foregoing, each of these Defendants violated Sections 5(a), 5(c) and 12(a) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c) and 77l(a).

107.   As a direct and proximate result of Don Basile's, GIBF's, Chris Basile's, and/or GIBF CI's offer and sale of unregistered securities, Plaintiffs have suffered damages in connection with their purchases of securities from Defendants.

## SECOND CAUSE OF ACTION

### State Law Violation for Unregistered Offer and Sale of Securities

### (By Plaintiffs Against Defendants Don Basile, GIBF, Chris Basile, and GIBF CI)

108.   Plaintiffs incorporate by reference all foregoing factual allegations as if fully set forth herein.

109.   The Token offering by Don Basile, GIBF, Chris Basile, and/or GIBF CI are securities within the meaning of the California Corporations Code.

110.   These Defendants, and each of them, by engaging in the conduct described above within California, directly or indirectly, sold and offered to sell securities.

111.   Plaintiffs purchased securities from these Defendants.

112.   No registration statements have been filed with any state or federal government entity or have been in effect with respect to the offering of securities alleged herein.

113.   By reason of the foregoing, each of these Defendants violated Sections 25110 and 25503 of the California Corporations Code.

114.   As a direct and proximate result of Don Basile's, GIBF's, Chris Basile's, and/or GIBF CI's unregistered sale of securities, Plaintiffs have suffered damages in connection with their purchases of securities from these Defendants.

115.   Plaintiffs are entitled to damages and recovery of his attorneys' fees under Section 25503 of the California Corporations Code.

116.   Alternatively, depending on this Court's choice-of-law decision, Plaintiffs are entitled to damages and attorneys' fees under Section 73-605 of the Delaware Securities Act.

# **THIRD CAUSE OF ACTION**

## **Securities Fraud in Violation of Section 10(b)**

## **of the Exchange Act and Rule 10b-5**

**(By Plaintiffs Against Defendants Don Basile, GIBF, Chris Basile, and GIBF CI)**

117.  Plaintiffs incorporate by reference all forgoing factual allegations as though fully set forth herein.

118.  Don Basile, GIBF, Chris Basile, and/or GIBF CI, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of securities, by the use of instrumentalities of interstate commerce or the mails, with scienter: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material facts in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

119.  The specific misrepresentations are set out in Paragraphs 2, 46, and 71 above.

120.  Plaintiffs reasonably relied upon these misrepresentations and acquired securities.

121.  By reason of the foregoing, each of these Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b) and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

122.  As a direct and proximate result of Don Basile's, GIBF's, Chris Basile's, and/or GIBF CI's securities fraud, Plaintiffs have suffered damages in connection with his purchases of securities from these Defendants.

**FOURTH CAUSE OF ACTION**

**Unregistered Dealer/Broker under Section 15(a)(1) of the Exchange Act**

**(By Plaintiffs Against Defendants Don Basile, GIBF, Chris Basile, and GIBF CI)**

123.   Plaintiffs incorporate by reference all foregoing factual allegations as if fully set forth herein.

124.   GIBF and GIBF CI are "dealers" as defined by Section 3(a)(4)(A), 15 U.S.C. § 78c(a)(5)(A) because they engaged in the business of selling securities (*i.e.* Tokens).

125.   Don and Chris Basile are "brokers" as defined by Section 3(a)(4)(A), 15 U.S.C. § 78c(a)(4)(A), because they engaged in the business of effecting transactions in securities (*i.e.* Tokens) for the account of others.

126.   By engaging in the conduct described above, these Defendants, acting as brokers, made use of the mails or other means or instrumentalities of interstate commerce to effect securities transactions in, or to induce or to attempt to induce the purchase or sale of securities while not registered with the SEC as a dealer or broker or when they were not associated with an entity registered with the SEC or FINRA as a dealer.

127.   A violation of Section 15(a)(1) does not require proof of scienter.

128.   By reason of the foregoing, each of these Defendants violated Section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1).

129.   As a direct and proximate result of Don Basile's, GIBF's, Chris Basile's, and/or GIBF CI's securities violations, Plaintiffs have suffered damages.

**FIFTH CAUSE OF ACTION**

**State Law Securities Fraud in Violations**

**(By Plaintiffs Against Defendants Don Basile, GIBF, Chris Basile, and GIBF CI)**

130.   Plaintiffs incorporate by reference all foregoing factual allegations as if fully set forth herein.

131.   Don Basile, GIBF, Chris Basile, and/or GIBF CI, by engaging in the conduct described above, offered or sold a security in the State of California by means of any written or oral communication that includes an untrue statement of a material fact or omits to state a material fact necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading.   The specific untrue statements of material fact made by Don Basile are set out in detail at Paragraphs 71-74 above and are incorporated herein by reference.

132.   By reason of the foregoing, each of these Defendants violated Section 25402 of the California Corporations Code.

133.   As a direct and proximate result of Don Basile's, GIBF's, Chris Basile's, and/or GIBF CI's securities fraud, Plaintiffs have suffered damages in connection with his purchases of securities from these Defendants.

134.   Plaintiffs are entitled to recovery of damages and attorney fees under the California Corporations Code.

135.   Alternatively, depending on this Court's choice-of-law decision, Plaintiffs are entitled to damages and his attorneys' fees under the Delaware Securities Act.

## SIXTH CAUSE OF ACTION

### Rescission under Section 29(b) of the Exchange Act

### (By Plaintiffs Against Defendants Don Basile, GIBF, Chris Basile, and GIBF CI)

136.   Plaintiffs incorporate by reference all foregoing factual allegations as if fully set forth herein.

137.   Section 15(a)(1) of the Exchange Act, 15 U.S.C. §78o(a)(1), makes it unlawful for a person to "effect a transaction in securities" or "attempt to induce the purchase or sale of any security" unless that person is registered as a broker or dealer under the rules and regulation of FINRA.

138.   Defendants GIBF and GIBF CI are not registered brokers or dealers with the SEC or FINRA and are not registered investment advisers with the SEC or any state.

SECOND AMENDED COMPLAINT

139.   Defendants Don and Chris Basile are not associated with a registered broker or dealer or investment advisor.

140.   Section 29(b) of the Exchange Act, 15 U.S.C. §78cc(b), provides that every contract made in violation of any provision of the broker-dealer registration requirements "shall be void" as to rights of persons who made or engaged in the performance of such contract.

141.   By the filing of this Second Amended Complaint, Plaintiffs exercise their right of rescission under Section 29(b) of the Exchange Act, 15 U.S.C. §78cc(b).

142.   As a direct and proximate result of Don Basile's, GIBF's, Chris Basile's, and/or GIBF CI's charging of and receipt of transaction-based compensation without being registered with the SEC or FINRA, Plaintiffs have suffered damages in connection with his purchases of securities from these Defendants and are entitled to rescission of the contract.

## SEVENTH CAUSE OF ACTION

### Fraud

### (By Plaintiffs Against Defendants Don Basile, GIBF, Chris Basile and GIBF CI)

143.   Plaintiffs incorporate by reference all foregoing factual allegations as if fully set forth herein.

144.   Defendant Don Basile on behalf of himself and GIBF and/or GIBF CI made a series of statements to Assofi.  These statements are set out in Paragraphs 2, 46, and 71 above of this Second Amended Complaint and are incorporated herein by reference.

145.   Each of these statements was deliberately false or made in reckless disregard of the possibility that it was false. Don Basile knew that his representations about Bitcoin Latinum were false.

146.   Don Basile intended that Assofi rely upon his statements and Assofi did, in fact, reasonably and justifiably rely upon his statements.

SECOND AMENDED COMPLAINT

147.   As a result of Don Basile's knowingly false statements and Assofi's reliance thereupon, Plaintiffs invested $15,555,329.

148.   Don Basile profited from the investment of those funds, and Chris Basile, as CEO of GIBF, and signatory to the SAFTs, and Managing Member of GIBF CI, had an interest in those companies and thus profited from Plaintiffs' funds as well.

149.   Plaintiffs have been damaged in the amount of $15,555,329.

150.   Don Basile's wrongful acts as described herein were intentional, malicious, oppressive and fraudulent, and were committed with reckless disregard of harm to Plaintiffs, in willful and conscious disregard of Plaintiffs' rights, such that Plaintiffs are entitled to recover punitive and exemplary damages against Don Basile, GIBF, Chris Basile, and GIBF CI in an amount that is sufficient and appropriate to punish these Defendants, as well as to deter them from committing similar acts in the future.

## EIGHTH CAUSE OF ACTION

### Conversion

### (By Plaintiffs Against All Defendants)

151.   Plaintiffs incorporate by reference all foregoing factual allegations as if fully set forth herein.

152.   Plaintiffs transferred a total of $15,555,329 to Defendants.

153.   Defendants have converted this sum in full by applying it to their own purposes while giving no value to Plaintiffs.

154.   Don Basile working alone or with Chris Basile funneled Plaintiffs' (and other investors') funds from GIBF, through GIBF CI, Monsoon Blockchain, JGLB, and/or Jean Luxe for purposes other than that of GIBF business expenses.

155.   Plaintiffs have demanded their funds be returned but to no avail.

156.   Plaintiffs have been damaged in the amount of no less than $15,555,329.

157.   Defendants' wrongful acts as described herein were intentional, malicious, oppressive and fraudulent, and were committed with reckless disregard of harm to

Plaintiffs, in willful and conscious disregard of Plaintiffs' rights, such that Plaintiffs are entitled to recover punitive and exemplary damages against Defendants in an amount that is sufficient and appropriate to punish Defendants, as well as to deter them from committing similar acts in the future.

**NINTH CAUSE OF ACTION**

**Violation of Penal Code § 496**

**(By Plaintiffs Against All Defendants)**

158.   Plaintiffs incorporate by reference all foregoing factual allegations as if fully set forth herein.

159.   California Penal Code § 496(a) provides that "every person who buys or receives any property that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the property to be so stolen or obtained, or who conceals, sells, withholds, or aids in concealing, selling, or withholding any property from the owner, knowing the property to be so stolen or obtained, shall be punished by imprisonment in a county jail for not more than one year, or imprisonment pursuant to subdivision (h) of Section 1170."  Sub-section (c) of Penal Code § 496 instructs that "any person who has been injured by a violation of subdivision (a) or (b) may bring an action for three times the amount of actual damages, if any, sustained by the plaintiff, costs of suit, and reasonable attorney's fees."

160.   As alleged above, Defendants have converted $15,555,329 which they obtained through theft and have refused to return same.  By this refusal, Defendants are unlawfully withholding those funds. Defendants received, concealed, and/or withheld the funds knowing that the funds were stolen property.

161.   Accordingly, as a result of the foregoing, Plaintiffs have been damaged and are entitled to recover three times the amount of his actual damages in addition to reasonable attorneys' fees.

## **<u>TENTH CAUSE OF ACTION</u>**

### **Unfair Competition (Cal. Bus. & Prof. Code § 17200)**

### **(By Plaintiffs Against Defendants Don Basile, GIBF, Chris Basile, and GIBF CI)**

162.   Plaintiffs incorporate by reference all foregoing factual allegations as if fully set forth herein.

163.   California Business & Professions Code § 17200 *et seq*., also known as the California Unfair Competition Law ("UCL"), prohibits acts of "unfair competition," including unlawful, unfair, fraudulent, or deceptive business practices.

164.   Don Basile, GIBF, Chris Basile, and/or GIBF CI, with actual or constructive knowledge, wrongfully accepted payment for Tokens that they never had any intention of releasing and/or Tokens that they knew could not be released.

165.   Don Basile, GIBF, Chris Basile, and/or GIBF CI have engaged in unfair business practices by creating a milestone for performance on their promise to Plaintiffs that could only be achieved in GIBF's sole discretion and/or by setting a condition precedent that was not feasible (*i.e.*, Latinum's "hard fork"). Their promise to Plaintiffs was thus deceptive, immoral, unethical, oppressive, unscrupulous and injurious to Plaintiffs.

166.   Don Basile's, GIBF's, Chris Basile's, and/or GIBF CI's acts, conduct and business practices are also fraudulent and/or deceptive. Don Basile on behalf of himself and GIBF made a series of statements to Assofi. These statements are set out in Paragraphs 2, 46, and 71 above of this Second Amended Complaint and are incorporated herein by reference.

167.   Each of these statements was deliberately false or made in reckless disregard of the possibility that it was false.  Don Basile knew that his representations about Bitcoin Latinum were false.

168.   Don Basile intended that Assofi rely upon his statements and Assofi did, in fact, reasonably and justifiably rely upon his statements.

169.   Don Basile, Chris Basile, GIBF and/or GIBF CI accepted payment from Plaintiffs based on Plaintiffs' reliance on Don Basile's and GIBF's statements.

170.   As a direct and proximate result of Don Basile's, GIBF's, Chris Basile's, and/or GIBF CI's unfair and fraudulent business practices, Plaintiffs have been injured in fact. They invested $15,555,329 in Bitcoin Latinum in reliance on Don Basile's and GIBF's representations.

171.   The above-described conduct by these Defendants constitutes deceptive business practices within the meaning of California Business & Professions Code § 17200 *et seq.*

172.   Pursuant to the UCL, Plaintiffs are entitled to disgorgement of all funds transferred to Defendants by Plaintiffs.

## ELEVENTH CAUSE OF ACTION

### Constructive Fraudulent Transfer (Cal. Civ. Code § 3439.05)

### (By Plaintiffs Against All Defendants)

173.   Plaintiffs incorporate by reference all foregoing factual allegations as if fully set forth herein.

174.   Plaintiffs have a right to payment from Don Basile and GIBF and/or GIBF CI, but Plaintiffs have received no payment from them.

175.   Without Plaintiffs' knowledge or consent, Don Basile transferred Plaintiffs' funds through a series of shell companies, such as Monsoon Blockchain, JGLB, and Jean Luxe owned and controlled by Don Basile and/or Chris Basile and/or Lemon in order to avoid GIBF's obligations to Plaintiffs and other investors.

176.   Such transfers of money were made without benefit or valuable consideration to GIBF or GIBF CI.

177.   Don Basile and the other Defendants acted with the intent to hide assets, hinder recovery, or move such funds beyond the reach of Plaintiffs.

178.   As a result of such transfer of funds, GIBF has become insolvent.

179.   Plaintiffs have been harmed by this transfer in the amount of no less than $15,555,329, and Defendants' conduct was a substantial factor in this harm.

## TWELFTH CAUSE OF ACTION

### Aiding and Abetting

### (By Plaintiffs Against All Defendants)

180.   Plaintiffs incorporate by reference all foregoing factual allegations as if fully set forth herein.

181.   Don Basile transferred Plaintiffs' funds through a series of shell companies, such as Monsoon Blockchain, JGLB, and Jean Luxe owned and controlled by Don Basile and/or Chris Basile and/or Lemon in order to avoid GIBF's obligations to Plaintiffs and other investors in GIBF's Token.

182.   Defendants all knew of Don Basile's purpose in transferring such funds away from GIBF and into companies owned or operated by Defendants, and through receipt of these funds, Defendants assisted, benefitted, and encouraged Don Basile's fraud and fraudulent transfer.

183.   As a result of Defendants' actions, Plaintiffs have been harmed in the amount no less than $15,555,329.

## PRAYER FOR RELIEF

Plaintiffs pray for judgment against Defendants as follows:

1.     For general damages according to proof;

2.     For special damages according to proof;

3.     For exemplary and punitive damages according to proof and in an amount sufficient to punish and set an example of Defendants, and each of them;

4.     For an order of rescission of the investments;

5.     For treble damages against Defendants;

6.     For interest due according to proof, including but not limited to prejudgment interest;

7.     For attorneys' fees according to proof;

SECOND AMENDED COMPLAINT

8.      For costs of suit herein incurred;

9.      Imposition of constructive trust;

10.     Appointment of a receiver pursuant to 28 U.S.C. § 3103; and

11.     For such other and further relief as the court deems just and proper.

Dated:  April 27, 2023                    ROME & ASSOCIATES, A.P.C.


                                          By: /s/ Eugene Rome
                                              EUGENE ROME
                                              Attorneys for Plaintiffs
                                              ARSHAD ASSOFI and ASSOFI, INC.

SECOND AMENDED COMPLAINT

## DEMAND FOR A JURY TRIAL

Plaintiffs hereby request a trial by jury on all issues triable by a jury.


Dated:  April 27, 2023                    ROME & ASSOCIATES, A.P.C.



                                          By:/s/ Eugene Rome
                                             EUGENE ROME
                                          Attorneys for Plaintiffs
                                          ARSHAD ASSOFI and ASSOFI, INC.

SECOND AMENDED COMPLAINT